```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    UNITED STATES OF AMERICA,        )   Docket No. 16 CR 00361-2
                                       )
 4                    Plaintiff,       )   Chicago, Illinois
                                       )   September 1, 2017
 5              v.                     )   9:37 a.m.
                                       )
 6    WILLIAM MIKAITIS,                )
                                       )
 7                    Defendant.       )

 8
      CLOSING ARGUMENT BY DEFENSE AND REBUTTAL ARGUMENT BY GOVERNMENT
 9          EXCERPT TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
         BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a Jury
10

11    APPEARANCES:

12    For the Government:     UNITED STATES ATTORNEY'S OFFICE by
                              MR. MATTHEW M. SCHNEIDER
13                            MS. NANI MAIA GILKERSON
                              Assistant United States Attorneys
14                            219 South Dearborn Street, 5th Floor
                              Chicago, Illinois 60604
15
      For the Defendant:      LAW OFFICES OF BEAU B. BRINDLEY by
16                            MR. BEAU B. BRINDLEY
                              MR. MICHAEL JAMES THOMPSON
17                            53 West Jackson Boulevard, Suite 1410
                              Chicago, Illinois  60604
18

19

20    (NOTE:  This is an excerpt of proceedings.  Page numbering will
      not correspond to any complete trial transcript that may be
21    prepared.)

22

23    Court Reporter:        GAYLE A. McGUIGAN, CSR, RMR, CRR
                              Federal Official Court Reporter
24                            219 South Dearborn, Room 2318-A
                              Chicago, Illinois 60604
25                            (312) 435-6047
                              Gayle_McGuigan@ilnd.uscourts.gov
```

Closing Argument - Mr. Brindley

1          (In open court in the presence of the jury:)

2              THE CLERK:  Case Number 16 CR 361, United States

3      versus Mikaitis.

4              THE COURT:  Okay.  Good morning, everyone.  Please be

5      seated.

6              Thank you again for your timeliness.  We are going to

7      finish up this morning.  It's time for the defense attorney's

8      closing argument.

9              Remember, not evidence, just argument.

10             And you may proceed, Mr. Brindley.

11     CLOSING ARGUMENT BY MR. BRINDLEY:

12             MR. BRINDLEY:  Thank you, your Honor.

13             Ladies and Gentlemen, at the beginning of this trial,

14     we told you that in a very fundamental sense this trial would

15     call upon you to ask a particular question, and that question

16     is who is -- Judge, can we get published to the jury?

17             THE COURT:  That's what I was just wondering.  Is it

18     defense?

19             MR. BRINDLEY:  Yes.

20             THE COURT:  I was trying to --

21             MR. BRINDLEY:  This one right here, Judge.

22             THE COURT:  Oh, it's on the evidence cart.  Okay.

23     Hang on a second.  That's a different one.  Give me just a

24     moment, please.

25             Let's see if that's doing it -- no.  There you go.

Closing Argument - Mr. Brindley

1     MR. BRINDLEY:  Thanks, Judge.

2     The question that we asked at the beginning the

3  evidence we said would answer is who is Dr. William Mikaitis.

4  Is he a dishonest con man who intentionally helped a fake

5  doctor give patients medicine with no medical reasons, knowing

6  they shouldn't have it?  Or is he an elderly doctor who made

7  the mistake of trusting a con man?

8     Only one of these two things can be true in this case.

9     Do the things you know about William Mikaitis lead you

10  to believe that he would purposely agree to patients getting

11  medication that they shouldn't have?

12     And the evidence answers that question about who

13  William Mikaitis is.

14     What do we know that's undisputed about William

15  Mikaitis?

16     William Mikaitis has been a doctor for 33 years.  He's

17  worked his way through school.  He stopped school in order to

18  enlist in, on his own, and serve his country in Viet Nam.  He

19  comes back, becomes an electrical engineer, gets a degree in

20  electrical engineering, and goes to work as a technician at a

21  hospital.  And he wants to go to medical school so badly that,

22  he can't get in here, he goes to Mexico, does his education,

23  and comes back here to do all of his clinicals and his

24  residency, and then he practices medicine uninterrupted for

25  more than 30 years, helping patients.

Closing Argument - Mr. Brindley

1          That is William Mikaitis.

2          In 2012 to 2015, the years in question, Dr. Mikaitis

3  had a thriving practice, according to the witnesses from the

4  hospital that were called by the United States.  They didn't

5  say he was disreputable.  They didn't say he was a bad doctor.

6  They didn't say he was some kind of a quack.  They said he was

7  one of their busiest doctors who worked at their hospital.  He

8  was a successful doctor who had been years at a reputable

9  hospital with a large practice.  He saw many patients.  He had

10  accolades for patient satisfaction as being number 9 out of 900

11  physicians in the Advocate system.  And he has a life-long

12  career as a family practitioner.

13          Ladies and Gentlemen, that is undisputably William

14  Mikaitis.

15          So then the question becomes this one:  Would a man

16  who has done all of that agree to a scheme, knowingly,

17  intentionally agree to a scheme, to have some con man

18  masquerade as a doctor?

19          And think about the consequences of that for William

20  Mikaitis.  To knowingly get in on the scheme, that means he's

21  willing to risk everything -- a career, a life, a reputation --

22  everything for this.  Would someone that did all of those

23  things that we just talked about knowingly agree to this?

24          And, Ladies and Gentlemen, there's something else to

25  consider, of course, about William Mikaitis, because, in

Closing Argument - Mr. Brindley

1    addition to all of that, all that he was that we've just talked

2    about, there's another fact that's undeniable.  By the time

3    this happened in 2013, William Mikaitis was more than 70 years

4    old.  Doctors, lawyers, judges, unfortunately, we all get old;

5    and when we do, people become more careless, they might become

6    more irresponsible, and they become much easier to be taken

7    advantage of.

8         And you got a little bit of a sense of that because

9    you saw the testimony of Dr. William Mikaitis.  And what you

10   saw from that testimony is someone who easily gets confused.

11   Dr. Mikaitis would be confused by questions asked by the lawyer

12   that's on his side and by questions asked by the lawyer that's

13   trying to challenge him.  He easily got confused and didn't

14   understand, both sides.

15        He wasn't one of these guys who sits up there and

16   understands everything his lawyer says perfect, and then the

17   minute they ask a question he doesn't know anything.  He wasn't

18   that guy.

19        Dr. Mikaitis, he had problems understanding both

20   sides, and that goes to the reality:  This is an elderly doctor

21   who isn't as sharp as he used to be, and that's someone you can

22   take advantage of if you want to.

23        And we also got a little bit of an image of how that

24   might happen in this case.  The prosecutor is cross-examining

25   Dr. Mikaitis, and the prosecutor says -- shows him one page

Closing Argument - Mr. Brindley

1   from that one patient file, that first page, and says, Looking

2   at this, there's no medical reason for this person to get the

3   drugs, and Dr. Mikaitis says, Well, I guess not, no.

4           Now, of course, you know that people that go to a

5   weight loss clinic -- pursuing weight loss is a legitimate

6   purpose, and every one of these people that went there wanted

7   to pursue a weight loss medication.  That's a legitimate

8   purpose.  The only way that it's not legitimate is if there's

9   something in the patient's history that says it's dangerous.

10  And he shows him one page without the rest, and Mikaitis says,

11  Well, looking at this, no.  Mikaitis then looks at all of it --

12  and Mikaitis was right.  There was nothing in that patient's

13  history showing any risk factors.  This was a person that

14  wanted medication, which is legitimate purpose, and there were

15  no risk factors.  There was nothing wrong with that person

16  getting the medicine.  But showing him one page, the prosecutor

17  fooled him, fooled William Mikaitis.

18          And if a prosecutor for the United States fools

19  William Mikaitis, imagine what a life-long con man and a lying

20  weasel like Michael Jennings could do.

21          Dr. Mikaitis, the whole idea is he's -- he's -- he

22  needs the money, he's doing it for the money.  That's their

23  whole theory.  That theory doesn't make sense.  Dr. Mikaitis

24  doesn't need the money because Dr. Mikaitis is already rich.

25  Dr. Mikaitis has been a doctor making a great living for 30

Closing Argument - Mr. Brindley

1    years.  He's one of the most successful doctors in their system
2    at Advocate.  Vesta Valuckaite says that he made a good living
3    before Results Weight Loss.  Vesta says they traveled and did
4    whatever they wanted before Result Weight Loss.  He had this
5    nice boat they went to.  He had the boat before Result Weight
6    Loss.  The account with all the money in it that they're
7    talking about, he had the account, putting money in it, before
8    Result Weight Loss.  Dr. Mikaitis didn't need the money.
9            And with all the risks that are for this -- allowing
10   some fake doctor to go out there and do this, risk your whole
11   career and everything, life-long doctors who have a lifetime of
12   making good money, they're not going to risk it for what this
13   was.  This is 45,000 -- it's a little bit more than that, but
14   it's close, because after you took out the cost of the drugs,
15   it was 98,000, divided over two years.  So it's less than
16   $50,000 a year plus whatever it was that they said he put down
17   on the car, 7,500 bucks.
18           No doctor who spent their life making money and has
19   made a career of it is going to risk it all for that.  It's not
20   enough.  It's not enough.  And there's no motive for him to
21   engage in this scheme with the risks, knowingly.
22           But what about Michael Jennings?  What do we know
23   about him?
24           Jennings is a con man.  Jennings is a liar.  He lied
25   to the patients on video in front of your eyes.

Closing Argument - Mr. Brindley

1     Sperando says Jennings is not an honest actor.

2  Sperando says Jennings and Sperando were, according to

3  Sperando, they were scheming about money behind Mikaitis's

4  back.  They're lying from the start.

5     Sperando -- excuse me, Mr. Jennings, he doesn't have a

6  formal medical education.  He hasn't invested a lifetime and

7  struggled to be able to have this job and this reputation.  He

8  hasn't.  He's done nothing.  He doesn't have a life-long career

9  to put at risk.  He has nothing to lose.  Michael Jennings is a

10 con man and a liar with nothing to lose.

11     So what's more likely?  That a doctor, who didn't need

12 the money, risked a life-long career and reputation for a con

13 man's scheme, with a pretend doctor?  Or that a con man took

14 advantage of an elderly doctor who got careless and got

15 irresponsible?  Which is more likely, common sense-wise?

16     It's more likely that the con man lied to the doctor.

17     Jennings lying to Mikaitis makes sense.  Mikaitis

18 risking everything for money he didn't need, his whole career,

19 that makes none.

20     And if Jennings lied to Mikaitis -- and this is

21 important, this is one of the frames that I'll keep coming back

22 to in this case -- if Jennings lied to Mikaitis, then Mikaitis

23 wasn't in on it, he didn't know, and he can't be guilty.

24     So in a big picture way, what the government has got

25 to prove is that Jennings wasn't lying to Mikaitis.

Closing Argument - Mr. Brindley

1          How do they prove that?  Did they prove that?

2          And when we think about that, there's one piece of

3     evidence I want to go through from the beginning.  Before I

4     even get to the law, there's one piece of evidence that I think

5     if you look at it carefully and you think about it will prove,

6     Jennings did lie to Mikaitis, because think about what it would

7     be if Mikaitis was in on it.  Right?

8          First of all, you know for each patient you have these

9     medical charts.  And on the far right side, every time there's

10    an entry, a doctor is supposed to sign.  Remember, it says

11    doctor, and you sign it all the way down.  Whoever the doctor

12    is that sees him signs, right?

13         Dr. Mikaitis is in on it, okay?  If he's in on it, he

14    knows Jennings isn't a doctor, he knows Jennings is seeing

15    patients when he's not supposed to, he knows he's giving him

16    medicines they're not supposed to have.  So if he's a doctor

17    and he's in on it, what's Dr. Mikaitis going to want to do?

18    He's going to want to make sure nobody finds out.

19         If he's in on it and he wants to hide what Jennings is

20    doing, whose signature is going to appear under the doctor on

21    every one of those lines?  Dr. Mikaitis.  Why?  Of course,

22    because if he's in on it, he's going to want to cover it up.

23    That's one possibility.

24         The other possibility is that Dr. Mikaitis is in on it

25    and he doesn't care at all.  He's not involved at all.  He

Closing Argument - Mr. Brindley

1    knows Jennings is doing it.  He doesn't care if Jennings is

2    doing it.  What's going to appear then?  It's going to be

3    Jennings' signature all the way down, because Dr. Mikaitis

4    isn't going to be signing it if he doesn't care.

5         The one thing that would never happen if Mikaitis was

6    in on it is you would never have a situation where Mikaitis is

7    signing the document in one place, showing that he's looking at

8    the chart, and then he allows Jennings, who he knows is not a

9    doctor and should never be able to sign under the doctor line,

10   to sign along with him, because that shows, hey, something is

11   wrong, a guy that's not a doctor that he knows is not a doctor

12   is signing his name along with his.  That would never happen if

13   he was in on it.  Doesn't make sense if he was in on it.

14        But this is the chart of Michael Perconte, and there

15   are others like this, one of the undercovers.  First line,

16   doctor signature, William Mikaitis.  And then underneath these

17   ones where he sent it out when he wasn't supposed to?

18   Jennings.

19        Ladies and Gentlemen, I ask you, if Dr. Mikaitis was

20   in on it, why would it ever look like this?  Why would

21   Dr. Mikaitis ever sign his name on a form to say, Hey, I'm

22   looking at this form, and then allow a man he knew was not a

23   doctor to sign underneath so there's evidence that he's

24   involved and he knows that somebody is not a doctor signed it.

25   It would never be.

Closing Argument - Mr. Brindley

1    The government gets to have the last word, and let

2    them explain to you why, why Dr. Mikaitis would ever do this if

3    he knew, because if he knew, it would make sense, it would be

4    all his signature, or all Jennings, if he was in on it.

5    If he's not, though, what would it look like?  If

6    Dr. Mikaitis told the absolute truth, what would it look like?

7    Jennings would come to Mikaitis and say, I need you to sign

8    this chart before medication is dispensed.  That's what he

9    would tell him.  And he would show him a chart with one line,

10    the vitals and the patient information, and ask him to sign off

11    before the medication is dispensed.  That's what Mikaitis says.

12    And so the first line would look just like this if Jennings was

13    lying to him.  And then Jennings goes behind his back because

14    he knows Dr. Mikaitis isn't going to agree to shipping medicine

15    to patients who haven't been in there.  What would you see

16    then?  We'd see Jennings' signature underneath, because

17    Jennings could never get Mikaitis to sign that.  If Mikaitis

18    was being lied to by Jennings, the chart looks just like this.

19    And there's nothing they can do to change it.  It's the

20    objective evidence in the case.

21    But it's better than that for Dr. Mikaitis because we

22    know that how this works is for each one of these entries,

23    what's happening is the person is putting in the information

24    and then signing their name after it's being put in.  Like when

25    he's going to send this stuff out, down here on lines 2 and 3,

Closing Argument - Mr. Brindley

1    he's putting in the information, then he's signing and sending

2    the medicine out, right?  Okay.  But we know Michael Perconte

3    got the medicine at a time William Mikaitis wasn't there.

4    Dr. Mikaitis wasn't there when Perconte came in.  So Jennings

5    filled all this out; but then for some reason, Jennings didn't

6    sign his name that time.  He waited.

7           Ladies and Gentlemen, why did Michael Jennings wait?

8    Why?  One reason, and it's what Dr. Mikaitis said, because he

9    had to tell Mikaitis, he had to tell Mikaitis that I need you

10   to sign this because the patient hasn't received medicine yet.

11   So he leaves it blank and he waits for the doctor, because he's

12   lying to him.  That's why it happens without Mikaitis there, it

13   happens with only Jennings there.  He fills in that line and he

14   stops and he waits.  And on the times when it's inappropriate,

15   when it's clear you can't send the medicine, he doesn't wait.

16   He signs it right there with his own name.  Why?  Why?  Because

17   he was lying to Dr. Mikaitis.  Why else?  Why do the charts

18   look like this?

19          Try this.  Here's another one.  All those folks like

20   Ms. Sumner that got all of those 48 deliveries of medicine out

21   there, wherever she lived, not coming to the clinic, look at

22   her chart.  Remember when I went down the chart with her?  What

23   was that letter all the way down, top to bottom?  Jennings.  It

24   was Jennings.  Never Mikaitis.

25          The lady in Arizona who never came to the clinic, they

Closing Argument - Mr. Brindley

1    were talking about yesterday, medical chart, whose name is all

2    the way down as the doctor?  It was Jennings.  It was never

3    Mikaitis.

4          Why?  Why?  If Mikaitis is in on it and wants to make

5    it look good, why isn't he signing these charts to make it look

6    good?

7          The only reason for him to sign at all if he's in on

8    it is to make it look good, so why wouldn't he?  He didn't.

9          Why?  Because Jennings knew that Mikaitis would never

10   ever sign off on that, ever.  And so you have charts that look

11   like he did it behind Mikaitis' back.

12         One more thing about the charts.  Look at the charts

13   you have in the patient files and see if there's any charts

14   where the first line is Dr. Mikaitis -- is Jennings and some

15   line down the list is Mikaitis.  Because if Mikaitis is in on

16   it, he knows Jennings is not a doctor and Jennings shouldn't be

17   signing the chart as if he is.  So if he's in on it, then it

18   makes sense at some point down the line he would sign it or

19   Jennings would have him sign off before he sent the medicine

20   out or something at some point.

21         It never happens.

22         The only way it happens is Jennings shows it to

23   Mikaitis with it blank, just like Mikaitis says, because he

24   thought he was approving the medicine, and then Jennings goes

25   behind his back for the rest.

Closing Argument - Mr. Brindley

1     And that tells you something else, that Jennings

2   knows.  Jennings knows that he can't ask Mikaitis to sign lower

3   on the chart for these medicines it sent out because Mikaitis

4   won't.  That means not only did Jennings lie to Mikaitis, but

5   Jennings knew that he had to because Dr. Mikaitis wouldn't go

6   along with it.

7     What is that, Ladies and Gentlemen?  That is objective

8   evidence suggesting and indicating, proving, Michael Jennings

9   lied to the doctor.  And if he lied, Dr. Mikaitis is not

10  guilty.

11     And so from the very start -- in fact, I believe this

12  is sufficient to say, is there a reasonable doubt about whether

13  Dr. Mikaitis knew?  The medical charts say yes.  Dr. Mikaitis

14  isn't guilty.  It is that simple.  There is a reasonable doubt,

15  and this is it, because there's no sensible way the chart looks

16  like this if William Mikaitis was in on it.

17     And I give that to the prosecutor, let him say

18  whatever they want to say, but the chart is going to say what

19  it says, and the chart is going to speak louder than he does,

20  and the chart is going to say it doesn't make sense,

21  Dr. Mikaitis isn't guilty, let him go home.

22     MR. SCHNEIDER:  Objection to that last comment.

23     THE COURT:  It's sustained.

24     MR. BRINDLEY:  Okay.

25     Judge -- I understand.

Closing Argument - Mr. Brindley

1        THE COURT:  Okay.

2        MR. BRINDLEY:  Before looking at the law, here's the

3   binary path that we have to examine.  Mikaitis has no motive to

4   do it, him doing it intentionally is inconsistent with facts we

5   have about him, and the medical charts suggest he was being

6   lied to.

7        Secondly, Jennings was conning and lying to a doctor

8   who is elderly and careless is consistent with what the medical

9   charts show and is consistent with what we know about Jennings.

10       When it's more consistent and it makes more sense,

11  it's what happened, folks.  That's the case.

12       And, yes, Dr. Mikaitis, maybe he should have asked

13  some other questions, maybe he should have known more things,

14  but being careless isn't the question.  He had to be in on it.

15  And they had to prove that Jennings was not lying to him, and

16  they can't, because the medical charts say that he was.

17       More importantly -- not more importantly, but in

18  addition, the government said, well, there's no -- there's no

19  medical office that works like this where you would -- the

20  doctor would have to sign to approve after the patients come in

21  and been seen by a nurse practitioner, doesn't work like that.

22  But the medical charts suggest that's exactly what Dr. Mikaitis

23  thought was happening.  Otherwise, there would be no way in the

24  world that Jennings would wait to fill in his name for people

25  that you know from the video came in at times Mikaitis wasn't

Closing Argument - Mr. Brindley

1    there.  He waits because he has to have Mikaitis think that the

2    person hasn't gotten the medicine yet.  Otherwise, there's no

3    reason to wait.

4         Let the prosecutor tell you why did Jennings wait if

5    Mikaitis knew it and was in on it.

6         Under the law -- the government talked about this a

7    lot yesterday.  The bottom line is these bold portions.  This

8    is what counts.  This is where the disagreement is.

9         He's charged with conspiracy to unlawfully distribute

10   a controlled substance outside the usual course of professional

11   practice and without a legitimate medical purpose.  And those

12   are two things.  It may be that it's outside professional

13   practice, but it also must be without a legitimate medical

14   purpose.  He must believe the person shouldn't have the drug,

15   there's some risk, there's some danger.  He must believe that

16   to be guilty.  That's what the law is.  And he must intend for

17   that to happen.  So that's the question.

18        They have to prove a doctor of 33 years agreed to

19   people getting medicine that they shouldn't have that would be

20   dangerous.  And with those medical charts, they cannot, and

21   they certainly cannot prove it anywhere close to beyond a

22   reasonable doubt.

23        They must prove he intended patients to get medicine

24   that was dangerous, that they didn't need.  And they can't do

25   that based on the medical histories.  They didn't send anyone

Closing Argument - Mr. Brindley

1   in there with a medical history showing a risk factor that was

2   seeking weight loss medication, which is a legitimate purpose

3   to seek medicine for.  They didn't show anybody that had a risk

4   factor where Dr. Mikaitis signed and said yes.  That's also a

5   fact.

6          Ladies and Gentlemen, only you can decide what beyond

7   a reasonable doubt means to you.  It is the highest standard of

8   proof there is in the courts.  But there are some things that

9   the judge will instruct you will not be sufficient.

10         The government must prove beyond a reasonable doubt,

11  you will be instructed, that the defendant was aware of the

12  illegal goal of the conspiracy and knowingly joined.  A

13  defendant is not a member of a conspiracy because he knew

14  and/or associated with people who were involved.

15         So the fact that Jennings is a scumbag and that

16  Dr. Mikaitis associated with him, that's not going to be

17  sufficient.  The law will be clear on that.  The judge will

18  instruct you on that.

19         Counts 2 to 8 follow right along with Count 1.  It

20  comes all, for us and for Dr. Mikaitis, down to Number 4, that

21  he distributed or dispensed controlled substance outside usual

22  course of professional practice and not for a legitimate

23  medical purpose.

24         And that's, again, the question.  Did he intend, did

25  he agree, did he want people and expect people to get medicine

Closing Argument - Mr. Brindley

1   that was dangerous for them that they shouldn't have?  They

2   can't prove that, because they can't prove that he wasn't being

3   lied to by Jennings.  And I'm going to keep coming back to that

4   throughout the whole way.

5            Counts 9 to 15, the issues are that did the

6   defendant -- did they prove that he dispensed or caused to be

7   dispensed prescriptions without a valid -- medication without a

8   valid prescription, prescription drugs, and that he acted with

9   the intent to defraud or mislead.

10           So what does it boil down to?  To be guilty, they have

11  to prove he was in on it, and he wasn't being lied to, because

12  he knew people were getting medicine that they weren't supposed

13  to have.  That's it.

14           This intent to defraud, you'll get an instruction

15  about what that means.  Bottom line is he has to either defraud

16  the government or the consumer.  If it's the government, he has

17  to materially interfere or obstruct a lawful government

18  function by deceit, trickery, dishonest means.  To do that,

19  he's got to be in on it, and Jennings -- they have to prove

20  he's not lying to him.  Period.  It's the same problem, and

21  it's the same thing.

22           The specific intent to mislead a consumer, they must

23  prove that he's misleading the purchaser about a material

24  nature of the product or the medicine.

25           Again, to do that, he's got to be in on it and

Closing Argument - Mr. Brindley

1    Jennings can't be lying to him.

2              The problem with the medical charts is inherent in the

3    middle of the case.  It will plague the government and it can't

4    go away, because Counts 1 to 15 are all impacted by that

5    reasonable doubt.  It's all about dispensing medicine.  Did he

6    intend the patients in Counts 1 to 8 to get medicine they

7    shouldn't have had because it was a danger?  Counts 9 to 15,

8    did he give medicine with specific intent to defraud or mislead

9    believing that it was unauthorized?  It all comes down to those

10   two things that I keep saying.  Was he in on it?  Was Jennings

11   lying to him?  Can they prove those things?  And they can't.

12   And they haven't.

13             Did they show you evidence that he was dispensing

14   medicine with the specific intent to mislead people so they got

15   medicine they shouldn't have so convincingly it's beyond a

16   reasonable doubt?  No.  Not with the medical chart evidence

17   that is undeniable, no.

18             Ask the question:  Is there reason to doubt the claim

19   that Mikaitis specifically intended to mislead patients and

20   provide them with medicine they shouldn't have?  Is there a

21   reason to doubt?

22             The medical chart says, yes, there is a reason to

23   doubt.

24             Every witness said they don't know if Mikaitis was

25   told the truth about what was going on.

Closing Argument - Mr. Brindley

1      Every witness said they didn't know if Jennings was

2   dispensing medicine without Mikaitis' knowledge.

3      Every witness said they didn't know if Jennings was

4   lying to Mikaitis.

5      MR. SCHNEIDER:  Objection to the characterization of

6   that evidence.

7      THE COURT:  Okay.  That's sustained.

8      MR. BRINDLEY:  Well, you can think back on the

9   evidence, and you can think back to all the witnesses that came

10  in here and testified from the clinics, everybody that came in,

11  and think about the question, because every one of them was

12  asked by me:  Do you know if Jennings was lying to Mikaitis?

13  And everyone, from Sperando to the other people that came in

14  the clinic, everybody admitted they didn't know.  No witness

15  knew.

16      So where is the proof?  Not -- not just the idea,

17  well, maybe he should have known, he could have known, he ought

18  to have known, he should have asked some questions, forget

19  that.  Where's the proof, the actual proof, that he did know,

20  that he was in on it, and that Jennings wasn't lying to him?

21  What's the proof that he told Mikaitis the truth?  What's the

22  proof that he knew the patients were getting medicines that

23  they weren't supposed to have, that there was a danger for in

24  their charts?  Where's the proof?

25      No one said he was told.  No one could say that he

Closing Argument - Mr. Brindley

1   knew.  Where's the proof?

2         The government uses certain forms of argument and

3   evidence to try to say they have it, but they don't.

4         The first form is this whole thing about the number of

5   pills.  There's 530,000 pills.  We looked at all these charts

6   to show that.  A bunch of pills got shipped.  Okay.  But you

7   know from the order sheets, they're all ordered by Mike.

8   There's no evidence he ever made one order or ever looked at a

9   single number of pills at any time.  He wanted Jennings to pay

10  the balance owed on the credit card.  Yes, of course he did.

11  The balance was owed on the credit card.  But there's no proof

12  he's regularly being told what the number of pills are at any

13  time.

14        You saw all those text messages.  Is he telling, hey,

15  I just ordered 500, I ordered 1,000, I ordered 2,000 -- no,

16  he's not.  He doesn't tell him that.  There's no indication

17  that he told him anything about the number of pills.  And

18  there's no indication that Dr. Mikaitis was cautious and paying

19  attention and looking for it.  It just doesn't exist.

20        When the shipments came to Lockport, however many

21  there were, is there any evidence he opened them and said, "Oh,

22  look at the number of pills," before Jennings picked them up

23  and took them to the weight loss office where they were

24  supposed to go?  No, there's not.

25        Now, the government could say, well, Dr. Mikaitis, he

Closing Argument - Mr. Brindley

1   wasn't supposed to be getting the weight loss drugs at his

2   office, they should have been going to the weight loss clinic.

3   That's something for medical boards.  That's something for

4   medical ethics people.  Maybe he should lose his license.

5   Probably should.  But that's not what this case is about.  This

6   case is about a crime.  Was he in on it?  And did they prove

7   that Jennings wasn't lying to him?

8           He testified that he trusted Jennings and he didn't

9   pay attention to the number of pills purchased.  And that's

10  consistent with all the evidence we see.  Is there proof he

11  paid attention?  There is not.  The only one reference in the

12  text messages where there were orders where some new company

13  appeared and he shut down the credit card because he thought he

14  was hacked, that's the only time.  It wasn't about a number of

15  times.  It was a different name than the company he expected.

16  That's all he saw.  There's no evidence he ever questioned the

17  number of pills, no evidence he ever knew the number of pills.

18          And can that possibly prove that he wanted patients to

19  get medicine they shouldn't have?  The number of pills?  It

20  can't, because it can't answer those important questions.

21          The government argues, well, he shipped them to

22  Jennings, Jennings wasn't a doctor, so he knew there was no

23  legitimate purpose.  That's not true.  It's undisputed that he

24  thought the drugs were for use at a weight loss clinic with

25  weight loss patients.  If he believed that, he didn't believe

Closing Argument - Mr. Brindley

1    there was no medical purpose, unless he looked at a chart and
2    saw somebody that came in seeking drugs for the legitimate
3    purpose of weight loss who had a risk factor that says they
4    shouldn't have it.  That's what they would have to prove that
5    he saw.  And they didn't prove that, they can't prove that,
6    because it's not true.  Nothing about the number of pills even
7    addresses that.
8              If he trusted Jennings and Jennings lied to him, he's
9    not guilty.  And nothing in the number of pills proves that
10   Jennings didn't lie.
11             So the pills aren't going to help them because they
12   don't get at his intent because they don't prove anything about
13   whether Jennings was lying or not.  If Jennings is lying to
14   him, the number of pills doesn't matter because he's lying.
15   It's not going to help the government.
16             The amount of money is the next thing.  He was paid in
17   cash, first of all.  Cash is suspicious.  This is the notion.
18   Fine.  But that's not going to help them answer the question.
19   The medical chart suggests Jennings is lying, so how is him
20   being paid in cash going to help this?  Does that prove that he
21   intended people with risk factors that shouldn't have gotten
22   the medicine?  They come in for the legitimate purpose of
23   weight loss, that they've got something in there that they
24   shouldn't have the medicine?  Does that prove he intended them
25   to get it, that he was getting paid in cash?  It doesn't even

Closing Argument - Mr. Brindley

1    touch it.  It doesn't even address it.  Does that prove he was

2    intending to defraud people about the medicine because he was

3    getting paid in cash?  No.  It doesn't touch it, because it

4    doesn't get to that question:  Was Jennings lying to him, and

5    was he in on it?  It doesn't come close.  If he's being paid in

6    cash and he wants to hide it, if somebody is, what do they do?

7    They take the cash home with them.  It's like those Congressmen

8    you hear about the load of cash up in the freezer or the drug

9    dealers who have got the big bags of cash, the gym bag down in

10   the basement.  That's what you do if you're hiding the cash.

11   You take it home.

12          Here's what you don't do:  You don't deposit in the

13   account that's got your name on it so that I and the agent here

14   can follow up on it and easily demonstrate, hey, it was

15   deposited over here by the weight loss clinic and Dr. Mikaitis

16   got the money.  You wouldn't do that if you're trying to hide

17   it if you think there's something wrong.  If you think there's

18   something wrong, you don't do that.  But he did nothing to hide

19   it.

20          Why not?  This goes back to if he was in on it, why do

21   the charts look like that?  Question one.

22          If he was in on it, why didn't he try to hide the

23   money?  Question two.

24          But if Jennings was lying to him, he wouldn't think

25   there was anything to hide.  Deposit it into the account.  It's

Closing Argument - Mr. Brindley

 1    fine.  The cash doesn't help them answer that question.

 2            Should cash payments have made him suspicious?  Yeah,

 3    probably.  Probably.  But even if they should, that's not the

 4    question.  You can't be convicted for being not suspicious

 5    enough.  They've got to prove Jennings wasn't lying to him.

 6    And if Jennings was lying to him, the fact that he was careless

 7    and old and wasn't suspicious enough doesn't help the

 8    government.  So the cash isn't going to answer the question

 9    because it doesn't get to that question of his intent, whether

10    he thought people were getting medicine that was a danger they

11    shouldn't have.

12            $85,000 got paid to Hauser over two years.  What about

13    that?  They talked about that for a long time.  We spent ages

14    looking at these charts and going through the line by line.

15    What does that prove about whether he intended people to get

16    medicines they shouldn't have?  What does that do to answer the

17    question was Jennings lying to him or was he in on it?  It

18    doesn't.

19            The money went into an account that he and his

20    girlfriend used for trips and expenses.

21            Well, what does that tell us?  If Jennings is lying to

22    him, like the medical charts suggest, if Jennings is lying to

23    him, then nothing about the amount of money means that he was

24    in on it.  It means he wasn't in on it.

25            His girlfriend and him using the money for trips and

Closing Argument - Mr. Brindley

1    expenses, it tells us nothing about him wanting people to get

2    medicine they shouldn't have and defrauding people.  It doesn't

3    even address the question.  The kinds of evidence the

4    government has doesn't address the question.  That's the

5    problem with this case.

6         Ms. Valuckaite says he had the account before, they

7    went on trips before, he wasn't reliant on Results Weight Loss

8    to have a good life with his girlfriend.  His girlfriend told

9    us that.

10        Yeah, he had an affair.  That's not a crime.  He's

11   married for a long time.  He shouldn't have done it.  He says

12   that.  But spending money on your girlfriend doesn't prove that

13   you, a doctor of 30 years, want people to have medicines that

14   are dangerous for them based on their histories.  It doesn't

15   prove that, it cannot prove that, nor can it address whether

16   you're being lied to by a con man.  This kind of evidence

17   doesn't help.

18        The Mercedes.  Honestly, who cares about the Mercedes?

19   Who cares?  He had money and he wanted to help his girlfriend

20   get a Mercedes.  Fine.  So what?  What does that tell us about

21   whether he wanted people to get medicine they shouldn't have?

22   What does that tell us about whether he wanted to defraud

23   people, have them get medicine they shouldn't have?  What

24   tells -- what about that tells us that Jennings isn't lying to

25   him?  Nothing.  Nothing.  That's the problem.

Closing Argument - Mr. Brindley

1       Over and over again, we spent all this time on

2  evidence that doesn't address the question of whether or not

3  he's lied to.

4       Ladies and Gentlemen, the government -- stop wasting

5  our time, stop wasting our time on evidence that doesn't

6  address the question, give us some evidence that does.  That's

7  what we've been waiting for this whole time.  But it never ever

8  came.

9       His taxes?  He -- his accountant does his taxes, like

10  lots of professionals.  There's no proof he hid his income from

11  his accountant, none whatsoever.  There's no evidence from John

12  Deraimo saying, Hey, the guy is a liar, he didn't tell me about

13  that.  Why?  They subpoenaed every other person who has

14  anything to do with this case.

15       MR. SCHNEIDER:  Objection, Judge, to that argument.

16       MR. BRINDLEY:  That argument is perfectly legitimate,

17  Judge.

18       THE COURT:  Wait, hold on, hold on.

19       MR. SCHNEIDER:  They could have called the

20  accountant --

21       THE COURT:  What did you just say?

22       MR. SCHNEIDER:  They could have called the accountant.

23       MR. BRINDLEY:  I'll address that argument, Judge.

24       THE COURT:  All right.  All right.  So there is going

25  to be a further instruction based on this, but continue your

Closing Argument - Mr. Brindley

1    argument --

2            MR. BRINDLEY:  I will.  Yes.

3            THE COURT:  -- and we'll address it before the jury is

4    out, okay?

5            MR. BRINDLEY:  The bottom line, and what I think he's

6    so getting exorcized about here, is that the defendant has

7    subpoena power, we can call whatever witness we want to call,

8    right?  Yeah, we can.  We did.  We called the witness who knew,

9    the witness who knew what happened, Dr. Mikaitis, to tell his

10   story and look at the government and say this is what happened.

11   If I'm lying, you prove it.  Bring somebody in here.

12           Did they bring you John Deraimo to say, Oh, Mikaitis

13   is a liar?  No.  Why?  He's not.  We don't need to call John

14   Deraimo if we called Dr. Mikaitis, and we know Deraimo --

15   whatever his name is -- Deraimo won't contradict him.  They got

16   to prove the case.

17           MR. SCHNEIDER:  Judge, I have a continuing

18   objection --

19           THE COURT:  Sustained.

20           MR. SCHNEIDER:  -- to this line of argument.

21           THE COURT:  It's sustained.  And we'll have an

22   instruction to the jury shortly.

23           MR. BRINDLEY:  There's no indication in any of the

24   evidence that you've got, because this case is about the

25   evidence that you got, and there's no indication that any of

Closing Argument - Mr. Brindley

1    the evidence you've got that Mr. Mikaitis knew anything about

2    how the accountant made decisions about what income to report.

3    There's just none.  The bank accounts and the money don't get

4    into the question:  Was Jennings lying to him, and was he in on

5    it?  It doesn't matter.

6          And, Ladies and Gentlemen, ultimately, the money going

7    into his bank account and not being hidden suggests he wasn't

8    trying to hide anything and he wasn't in on it.

9          And if the idea is, based on the government's

10   cross-examination, well, you can't believe Mikaitis because he

11   didn't read line, but he signed his name on his return, and he

12   didn't read line by line everything on his tax returns prepared

13   by his accountant?  There are going to be a lot of people

14   getting in trouble if that's the standard.  Or that he took a

15   job, but he didn't read the fine print and go through every

16   paragraph in his employment agreement, so that means he was

17   giving people medicine thinking it was dangerous for them?  You

18   don't use those arguments if you've got proof that he lied.

19   You use those arguments if you're trying to stretch the absence

20   of proof.  And you do that -- you don't do that, you don't use

21   these kinds of throw-away, stupid arguments if, if, you really

22   have the proof.  You do it if you don't and you're trying to

23   gloss over it.

24          The text messages.  Yes, he contacted Jennings about

25   wanting to get reimbursed for drug purchases.  Of course he

Closing Argument - Mr. Brindley

1    did.  If Jennings was lying to him, and he believed he was

2    signing off on the charts and dispensing medicine only to those

3    who qualified, he would still be wanting the money back, so

4    those text messages don't help.

5          The texts show he was regularly at the clinic, which

6    is consistent with what he said about reviewing the charts.

7    And there's a bunch of them talking about when he's going to

8    come by the clinic.  I'll be coming by around noon.  I'll be

9    coming down around 1:00 or 1:30.  I'll be there within the

10   hour.  The government is going to say all he was trying to do

11   is collect his money, but that's not true either.  One text

12   message tells that story.  Here are the monies discussed, can

13   you make the deposit?  So the money is going into the account

14   being deposited by Mike.  But Dr. Mikaitis is still coming to

15   the clinic.  So this time it's not about the money.  And if all

16   he cares about -- he's the no-show doctor, right?  He's the

17   no-show doctor, and the no-show doctor doesn't care about

18   anything but the money.  So if the money is being deposited

19   now, what's he going over there for the next day?  What for?

20   To review the charts, because that's what he thought was going

21   on.  He might be stupid, he might have been foolish, he

22   probably should lose his medical license.  But, Ladies and

23   Gentlemen, this suggests he was doing exactly what he said.

24   And this is another one of these pieces of evidence the

25   government can't change.  It's consistent with him reviewing

Closing Argument - Mr. Brindley

1   the charts, because there's no other reason to be going there

2   if he's the no-show doctor.

3          Then we have this one.  We heard it yesterday.  Well,

4   he doesn't even know the office address?  This is December of

5   2014.  Give me a break.  You can't have it both ways.  They say

6   he's going there all the time.  He's going there all the time

7   because he wants to get his money.  He's so greedy.  Give me

8   the envelope, give me the envelope.  Okay.  Well, then he knows

9   where it is, right?  So him asking about the address, that

10  doesn't mean he hasn't been there.  You can't argue both

11  things, A and not A, at the same time.

12         But when you start playing that game, when the

13  government, the U.S. Government prosecutors go around and when

14  they start playing that game, they argue once, Oh, he was there

15  or he wasn't -- he was there all the time trying to get his

16  money, and then when he didn't know the address, he wasn't ever

17  there, you know they don't have a case.  If they had a case,

18  they wouldn't be playing those games.  They'd give you evidence

19  that made sense, and they wouldn't argue both A and not A.

20         He needed the address for Vesta, the exact office

21  address.  Does that make sense?  Yes.  Does the thing they said

22  make sense?  No.

23         All right.  Then there's this one:  Don't give her any

24  info.  She's okay.  Better that she knows very little.  And

25  they say, well, this proves he was trying to hide what was

Closing Argument - Mr. Brindley

1    going on at the weight loss clinic from Vesta. And to do that,

2    he questioned Dr. Mikaitis. But this is another one of those

3    instances where you see Dr. Mikaitis gets easily fooled. Look,

4    he said to him, Well, Vesta, she made cash deposits for you,

5    right? And Dr. Mikaitis says, Oh, yeah, I guess she did. So

6    she knew what the amount of money was, right? Yeah.

7            But the government called Vesta. This is why it was a

8    trick. The government called Vesta. They asked her, Did you

9    make cash deposits for Dr. Mikaitis? No. She didn't. They

10   knew that.

11           When the questions were asked to Dr. Mikaitis, he was

12   being fooled. They were saying, Well, she made the deposits

13   for you, so she knew the amount of money, acting like it was

14   true when they knew all along she already testified it was

15   false.

16           So his explanation, he didn't want his girlfriend to

17   know about the money because they were having a fight, it does

18   make sense. And the way they used to try to say, Oh, he was

19   lying? It was just him getting fooled, when the evidence they

20   put on themself said their premise was wrong.

21           On top of that, look at this date. It's May 29th,

22   2014. Okay? So if he's trying to hide what's going on at the

23   weight loss clinic, how does it make sense that -- you've seen

24   it, we went through it yesterday -- 15 days earlier he sends

25   her over there to pick something up. All the way back in March

Closing Argument - Mr. Brindley

1   of 2014, he sends her there to pick something up.  She says she

2   had talked to him about being worried about the drugs and him

3   saying I'm concerned about it, too, I'm going to check the

4   charts, I'm looking at it.  She says he did all that right at

5   the beginning.  So if the idea is he has to tell Jennings don't

6   tell her anything so she'll find out what's going on at the

7   weight loss clinic because she's suspicious -- that was the

8   argument they were making -- well, why in the world would he

9   wait until the 29th when she's already been there how many

10  times before?

11          Again, their argument doesn't make sense.

12          When we take into account her account that, No, I

13  didn't make cash deposits, I didn't know what the amount of

14  money was, which is what she said, take away trying to fool

15  some old guy on the stand who doesn't follow that quickly, his

16  explanation makes sense.  Theirs doesn't.

17          And none of this tells us anything about the questions

18  we need to answer.  None of this tells us was he in on it?  Was

19  Jennings lying to him?  It just doesn't, especially not when

20  their theory of it doesn't make sense with what the evidence

21  is.

22          Then there was the agent interview, where the agent --

23  again, every time the government claims they have some piece of

24  evidence, somehow it doesn't make sense, and that's weird.  In

25  a case with proof beyond a reasonable doubt, you would not

Closing Argument - Mr. Brindley

1    expect that.

2            What does the agent say?  Mikaitis said he was at the

3    Results Weight Loss during the regular office hours, and he

4    personally sees the patient, he's there with the charts

5    personally seeing the patients on a regular basis.  Okay.

6            But then she says Mikaitis also said he was signing

7    off on the medical charts.

8            She didn't deny it when she testified.  That's

9    idiotic.  If you're the doctor and you're seeing the patients,

10   you're signing off on the charts right there, you don't need to

11   review them.  You're preparing them.  There's no review if

12   you're the doctor.

13           It's like the -- Ms. Singh, the nurse practitioner

14   said.  Well, he's not going to need to review the charts, he's

15   only going to need to review some, even with somebody else, if

16   a nurse is seeing, he only needs to review some.  That's what

17   she said.  So if he's doing it himself, he's not reviewing

18   anything.

19           And the agent didn't deny that, hey, that is

20   contradictory, that don't make any sense.

21           So seeing that, think about what this was.  This was

22   her going in there and wanting to question a guy that she

23   thinks is lying.  He says I'm here every day.  She thinks he's

24   not.  She thinks he's lying.  Then he says I have to review --

25   what I do, I review the charts all the time.  Well, that

Closing Argument - Mr. Brindley

 1   doesn't make sense if he's there every day.  You're the agent.

 2   You want to catch somebody in a lie.  That's what they do.

 3   It's their job.  So what do you do?  You hear him say one

 4   thing:  I'm there every day.  Then you hear him say the

 5   contradictory thing:  Well, I have to sign off on the charts.

 6   You say:  Hey, what are you talking about, buddy?  You're

 7   lying.  If you were signing off on the charts, you wouldn't be

 8   there every day.  And what was her explanation for how that

 9   dialogue didn't happen?  Her explanation was I asked no

10   follow-up.  That's all she could say.

11         Why not?  Why, at this critical moment when the doctor

12   is saying, Oh, I was there this time that they believe he's

13   not, and then he says the contradictory thing that would prove

14   that he's lying, why is that the moment that the agent decides

15   now I will suspend my intellectual curiosity?  Why would that

16   ever be?

17         The same thing is true of this.  She says he tells her

18   about his practice in Lockport.  Well, that would disprove that

19   he's at Results Weight Loss, because if he's saying he's there

20   every day and then he tells her about Lockport, Lockport is

21   going to provide evidence that proves he's lying, so why would

22   he do that?  If he's going to say, "I'm here every day at the

23   Results Weight Loss," he's not going to turn around and say,

24   "Hey, I also work at Lockport," so they can go and prove he's

25   lying.  That's ridiculous.

Closing Argument - Mr. Brindley

1           What's more likely?

2           One, that Mikaitis says he's there every day seeing

3    patients, but then inexplicably says, "But I have to sign off

4    on all the charts, I have to review the charts," and that the

5    agent inexplicably doesn't ask any follow-up questions?

6           Or, two, that there was a miscommunication with this

7    guy -- and you've seen how easy that is to happen, watching him

8    testify on both sides of this case -- there's a

9    miscommunication and he thought he's talking about Lockport and

10   she thinks he's talking about Weight Loss.

11          Two makes sense; one doesn't.

12          Under one, her actions don't make any sense, and

13   neither do his.

14          Same is true for the other one.  What is more likely?

15   That he lies and says he's at Results Weight Loss and then

16   gives the information about Lockport to expose his lie?  Or

17   that he thinks they're talking about Lockport and she thinks

18   they're talking about Weight Loss?

19          Two makes sense; one does not.

20          Is there a reason to doubt the agent interview?  Yeah,

21   there is.  And that's the only person that ever said Mikaitis

22   said anything that was dishonest about this at all.

23          On top of it, it is worse because they didn't record

24   it.  This is supposed to be the interview.  They record all

25   kinds of stuff.  You see they're recording what these people

Closing Argument - Mr. Brindley

1   are saying to Jennings.  So now we've got the doctor sitting

2   down there, admitting, Hey, I'm here at Results Weight Loss,

3   which they know to be a lie, and they don't record it at all?

4   They don't have him sign a written statement?  They decide that

5   on this one case, as DEA agents, we don't want to have any

6   proof.  We want him -- he's going to give us the proof that

7   says he's lying, but we don't want to have it documented in any

8   way.  Do you think the DEA would do that?  No.  It doesn't make

9   any sense.

10          They chose not to let him review the report or the

11  summary and indicate whether there was any miscommunication.

12  Why?  If it's clear-cut and he's saying that he did it and he's

13  explaining it, why not let him review it and say, Okay, yeah, I

14  lied, especially because the next day they say that when they

15  go back, he tells them he wasn't there every day and tells them

16  that he did review the charts.  He sticks with the charts thing

17  both days, according to the story.

18          Well, if he's going to say that, then why wouldn't

19  they have him review and say, Okay, hey, I lied.  Make a

20  statement then, record his statement, and do something to prove

21  it.  And they don't.  And that doesn't make any sense.

22          The prosecutor is going after a doctor, trying to take

23  away his livelihood.  Look at this.

24          MR. SCHNEIDER:  Objection.

25          THE COURT:  Sustained.  That's sustained.

Closing Argument - Mr. Brindley

1        MR. BRINDLEY:  The agents -- the agents who are
2   investigating that are going to decide not to have any proof of
3   the statements?
4        MR. SCHNEIDER:  Objection to that comment as well.
5        THE COURT:  Sustained.
6        MR. BRINDLEY:  That doesn't make any sense.  Didn't
7   make any sense back then, during the trial doesn't make any
8   sense, now when you think about it, that's not how it should
9   be.
10       And then this DEA registration surrender.  We heard
11  all about that yesterday, as if, well, that was the proof.  He
12  admitted he was wrong because he surrendered his DEA.
13       You know what?  Maybe we ought to look at the evidence
14  instead of just talk about it that way.  So let's look at what
15  it says.
16       It says in view of my alleged failure to comply with
17  federal requirements and as an indication of my good faith in
18  desiring remedy to correct any unlawful practices, I
19  voluntarily surrender.
20       As an act of cooperation and good faith, he
21  surrendered and said go ahead and investigate.  Why?  Because
22  he thought it was okay all along.  Jennings was lying to him.
23  He's got nothing to hide.  If he's got something to hide, he's
24  not going to surrender anything.  He's not going to do
25  anything.  He's going to get on the horn and call his lawyer.

Closing Argument - Mr. Brindley

1    He didn't do that.  As a showing of good faith, go ahead and

2    investigate.  You can have my -- this certificate for now.  I

3    voluntarily give it up.

4            An admission of guilt?  No.

5            Stretching the evidence to try to make it more than it

6    is?  Yes.

7            And I come back to that.  When do we stretch the

8    evidence?  When we don't have proof beyond a reasonable doubt.

9    Because if we do, we don't need to.  We don't need to call

10   someone saying in good faith investigate, someone saying I'm

11   guilty, you don't do that.

12           Nothing about this interview -- ultimately, all we

13   have is reason to doubt its contents.  It's not clear, doesn't

14   make sense, and nothing about it gives an indication that this

15   guy wanted to give people medicine they shouldn't have and that

16   Jennings wasn't lying to him.  It just doesn't do it.  It

17   can't, because it doesn't make any sense on its face.

18           The expert witness, Dr. Piotrowski.  What does she --

19   Well, his charts weren't detailed enough.  He's not charged

20   with not having detailed enough charts, folks.  This isn't a

21   negligence case.  It's not a medical malpractice case.  In that

22   case, you could say, Well, he should have had blood panels in

23   there, he should have had more details, the charts are too old.

24   You could say that.  But not in this case.  This case they had

25   to prove Jennings wasn't lying to him and he was in on the

Closing Argument - Mr. Brindley

1    scheme.   The doctor can't help us with that here.

2          Maybe he's not up to par on his practice or these

3    charts aren't up to par.  Who cares?  That doesn't answer the

4    questions.  It doesn't make the difference.

5          Not demonstrating -- demanding more detailed charts

6    doesn't say he wanted people to get medicine they shouldn't

7    have, and that's what they have to prove.  And it doesn't say

8    Jennings wasn't lying to him.  The actual medical charts we

9    reviewed that I keep referring to suggests Jennings was.  This

10   doesn't change that.

11         The other thing is Dr. Piotrowski looks at the patient

12   charts and says some of these people that Mikaitis had signed

13   off on on the undercovers, but she doesn't think they should

14   have gotten medicine because they didn't have the right body

15   mass index.  Okay.  Dr. Mikaitis looks at those and says,

16   Well -- he admitted or agreed that people involved in fitness

17   often come in and want to get these medicines.  Okay.  And in

18   addition to that, the bottom line here is it's certainly no

19   doubt, the government isn't going to argue that it's not a

20   legitimate purpose for somebody to come in and say I want the

21   medicine for weight loss.  That is a legitimate medical

22   purpose.

23         So the question is is there something in the patient

24   chart that says it's a risk.  Dr. Piotrowski didn't say that

25   there was, because there was not.  The fact that she thinks it

Closing Argument - Mr. Brindley

 1    should be some other way or she cares more about body mass

 2    index, what does that mean?  It means that this man, who has

 3    been a physician for 33 years and has a more antiquated

 4    practice, sees it one way and some other doctor sees it

 5    another.  That doesn't mean Jennings wasn't lying to him.  That

 6    doesn't mean he wanted people to get medicine that was

 7    dangerous.  And, in fact, the medical histories, none of them

 8    indicated the danger factor.  And every one of those people

 9    went in there and said they wanted weight loss medication,

10    which is a legitimate medical purpose as long as there's no

11    danger.  There's no disputing that.

12              MR. SCHNEIDER:  Object to that.

13              MR. BRINDLEY:  I -- that's an argument, Judge.

14              THE COURT:  Okay.  Ladies and Gentlemen, as far as the

15    evidence is concerned, if it differs from what you know it to

16    be, then it's your collective understanding that will prevail,

17    and the arguments and reasonable inferences, as I mentioned

18    before, are not the evidence.

19              So you may continue.

20              MR. BRINDLEY:  He proves -- well, what the doctor

21    proves that Dr. Mikaitis, maybe he should have been more

22    careful.  He definitely should have been.  His methods were too

23    antiquated.  He's talking about this is how we used to do it in

24    the old days.  That's how I -- old-school chart.  That doesn't

25    mean he's guilty of this crime and he wants people to get

Closing Argument - Mr. Brindley

1   medicine that's dangerous for them and they shouldn't have it,

2   and it doesn't mean Jennings wasn't lying to him.

3          She admits she didn't know what files he was shown.

4   She admits she didn't know if he was advised how the medicines

5   would be distributed.  And she didn't know if Jennings was

6   lying to him.

7          She can't help us with the question that matters.

8   She's a great doctor, she's got great credentials, she's a

9   super-smart lady, I respect that doctor, but she can't tell us

10  anything about the questions that count.

11         Every piece of evidence suffers from that same flaw.

12         Dr. Piotrowski couldn't tell us that Dr. Mikaitis

13  intended patients to get medicines without a medical purpose

14  because she doesn't know if he was being lied to.  And she

15  couldn't tell us whether he intended to defraud because she

16  doesn't know if he was being lied to.  And telling me she

17  didn't interview him, Dr. Mikaitis, at all, to find out his

18  side of the story -- she was a paid witness, paid by the

19  United States government, who only looked at the things that

20  the people that paid her provided.  Maybe that's not unusual,

21  but it certainly doesn't help us get to the answer in this

22  case.

23         Mr. Jones is an investigator.  And what does he tell

24  us?  He got a complaint about Jennings and not Mikaitis.  He

25  didn't tell Mikaitis what was going on, didn't hear Mikaitis'

Closing Argument - Mr. Brindley

1    reaction, doesn't know anything about what Mikaitis knew, can't

2    tell us whether Jennings lied to him.

3           The undercover recordings showed Jennings lying,

4    showing dispensing medicines while the doctor isn't there.  The

5    undercover agents don't know if Mikaitis sees their charts.

6    Looks like he signed off on some, but we already looked at the

7    medical chart evidence.  The medical chart evidence suggests

8    Jennings waited, instead of putting it in when the patients

9    came in.  Only reason to wait is because he told and lied to

10   Dr. Mikaitis and said he thought he was supposed to approve it

11   before the medicines went out.  That's the only explanation for

12   the wait.

13          Undercover recordings don't get at the question:  Was

14   he in on it?  Or did Jennings lie to him?

15          The business card.  There's no problem with his name

16   being on the business card.  He was reviewing the charts and

17   approving the medicines.  That's what he says.  He had the DEA

18   number.  He knew that.  He signed for the nurse practitioner.

19   And there's no evidence that Jennings ever told him she stopped

20   working.  There's no evidence that Jennings has ever told him

21   that he was seeing patients without anybody else there.  There

22   just isn't any evidence.  The business card certainly isn't

23   going to get them there.

24          The picture of all the files.  Ladies and Gentlemen,

25   there's no indication for -- that Dr. Mikaitis would have known

Closing Argument - Mr. Brindley

1   how many of those were patient files from before he ever came

2   to the clinic.  There's no indication for how many of those

3   files are for patients that might not be receiving medicine.

4   He said there were 4,000 patients he thought, but that doesn't

5   indicate that he thought any of them were receiving medications

6   without legitimate medical purpose, and doesn't indicate

7   anything about whether Jennings was lying to him or not, so

8   it's not going to help.

9        The government has picked a handful of patient files

10  to put into evidence, and you have those to look at.  Those

11  patient files suggest he was being lied to.  There aren't any

12  others to suggest otherwise.

13       He testified that Jennings told him he would be

14  reviewing all charts and approving before anyone received

15  medicine.  If true, he's innocent.  He's not guilty.

16       I already talked about Dr. Piotrowski.

17       So where is the evidence that proves that he lied?

18       We just went through every piece of evidence.  It took

19  a long time.  We went through every piece of their evidence,

20  every category.  None of it proves beyond a reasonable doubt

21  Dr. Mikaitis lied.  In fact, the fact he wasn't hiding the

22  money, the fact the medical charts the way they are proves that

23  he's telling the truth.  There's no proof he lied.  And there's

24  no proof that he wasn't duped by Michael Jennings.

25       The kinds of evidence that would actually prove that

Closing Argument - Mr. Brindley

1   Dr. Mikaitis intended and knew that this was going on would be

2   evidence in the medical chart that he was covering up, that he

3   was signing when he wasn't there, he was suggesting he was

4   there when he was not, and the medical charts, covering for

5   Jennings.  The medical charts show that that didn't happen.  It

6   would be evidence from somebody that was actually talking to

7   Mikaitis who was saying, Hey, Mikaitis was in on it.  He knew

8   because we had a conversation.  There's no evidence like that.

9   The kinds of evidence that would go to those questions are the

10  kinds of evidence that are missing in this case.  That's just

11  our reality.

12          He's not guilty, folks, of Counts 1 to 15.  He's just

13  not.  The best they could say is that he should have been more

14  suspicious, that he should have done more to investigate.  This

15  is the best argument, it seems like it is, because there's

16  some -- there's some logical force to it.  Why didn't you ask

17  Jennings what was going on?  Why didn't you ask more questions?

18  Why didn't you pay more attention?  Why didn't you look at the

19  number of pills?  What do you do with them?  Okay?  Those are

20  part -- that was -- most of the cross-examination of William

21  Mikaitis was that.

22          So, Ladies and Gentlemen, it's not sufficient to prove

23  that he should have investigated.  And you're going to be

24  instructed on this specifically.  They had to prove that he

25  agreed or, in other words, they had to prove Jennings wasn't

Closing Argument - Mr. Brindley

1   lying to him and he was in on it, the things I keep talking

2   about.

3        Yesterday, the government showed you part of an

4   instruction.  They showed you an instruction about -- that

5   talks about the words "deliberate indifference," but the

6   instruction they showed you yesterday was half of it.  The last

7   part was cut off.

8        I'm going to go ahead and look at the whole

9   instruction now, and the last part is the bold part that you

10  didn't get yesterday.

11       You may not find that the defendant acted knowingly if

12  he was merely mistaken or careless in not discovering the truth

13  or if he failed to make an effort to discover it.

14       That is getting at exactly what their arguments are.

15       All this stuff about, well, he should have -- he

16  should have --

17       MR. SCHNEIDER:  Objection, Judge.  That's not the

18  correct jury instruction.

19       MR. BRINDLEY:  Yes, it is.

20       THE COURT:  I will take a look at it and make sure.

21  I'm the one that gives you the law, and the instruction I give

22  you will be the correct one.  So if there is a dispute, why

23  don't we take it down.  You can continue your argument, though.

24       MR. BRINDLEY:  I actually think I know what it is.

25  I'm going to correct it now.

Closing Argument - Mr. Brindley

1    I think it actually is going to say that he took

2  actions to deliberately avoid the truth.  I think those are the

3  words that are missing.  That last part, the part I'm talking

4  about, though, that's exactly what you're going to hear.

5    MR. SCHNEIDER:  I object to an incorrect instruction

6  being shown.

7    THE COURT:  Okay.  Ladies and Gentlemen, it's my

8  instruction.  Just wait for mine and follow mine.

9    MR. BRINDLEY:  All right.

10    THE COURT:  They can argue the facts.

11    MR. BRINDLEY:  Right.

12    THE COURT:  I'll give you the law.

13    MR. BRINDLEY:  Let's get to what the part actually

14  says that they're not disputing, let's look at it, because what

15  it says is important.

16    THE COURT:  Take it down, please, since it isn't

17  correct, please.  Take it down.

18    MR. SCHNEIDER:  Ask that it be removed.

19    MR. BRINDLEY:  Judge, can you just un-publish so I can

20  read from it for a minute --

21    THE COURT:  Oh, sure, I can do --

22    MR. BRINDLEY:  -- and then we'll republish in a

23  second.

24    THE COURT:  I can do that.  Yes, I can.  Hang on.

25    MR. BRINDLEY:  Okay.  So I can see it and you can't.

Closing Argument - Mr. Brindley

1          But here's the reality:  This part that I'm going to

2     read, nobody is saying that it's wrong, okay?  Because this is

3     exactly what you're going to hear.

4          Objections aside, this is what you're going to hear:

5          You may not find that the defendant acted knowingly if

6     he was merely mistaken or careless in not discovering the truth

7     or if he failed to make an effort to discover the truth.

8          All of those arguments go to that.

9          This whole thing, you should have asked more

10    questions, you should have looked at the number of pills, you

11    should have looked at the number of files, you shouldn't have

12    gone in the side door, all of that falls into that exact

13    category.  You may not find that he acted knowingly if he

14    failed to investigate to cover -- discover the truth.

15         This is the part that you didn't see yesterday.

16         You may not find mistaken or careless in discovering

17    the truth.

18         All of their arguments about William Mikaitis go to

19    this category that you're going to be instructed under the law

20    is not sufficient.

21         So should have, could have, be more suspicious, ask

22    more questions, doesn't work.  And that's the law.

23         Judge, we can re-publish.

24         THE COURT:  Sure.

25         MR. BRINDLEY:  You're not going to be instructed that

Closing Argument - Mr. Brindley

1    it's sufficient to prove that he should have been suspicious or

2    that he should have known what was going on or he should have

3    required more detailed charts.

4           The instruction you're going to get is what I just

5    read, and it says none of that is enough.

6           It may be a breach in medical duty, it may be that

7    he's gotten too old to practice medicine, he's too careless,

8    his license should be lost, but he's not guilty of this crime

9    because there's no proof of bad intent, no proof that Jennings

10   wasn't lying to him.

11          He's not guilty of Counts 1 to 15.

12          Count 16 and 17, I'm not going to spend a lot of time

13   on -- oh, no, I'm not -- I haven't gotten there yet.

14          There's two other theories the government may advance

15   we should talk about first.

16          One is, and you saw it yesterday, that Dr. Mikaitis

17   could be held responsible for Jennings' actions, but in order

18   for that to be, you will be instructed that he can only be held

19   responsible for Jennings' actions if he was a member of the

20   conspiracy and it was reasonably foreseeable.  But what that

21   comes down to is he had to agree to be a member of the

22   conspiracy, meaning he had to be in on it, and Jennings

23   couldn't be lying to him.

24          This theory doesn't help them unless they can prove

25   that Jennings wasn't lying, and the medical charts prove and

Closing Argument - Mr. Brindley

1    indicated that he was.

2           So this alternate theory doesn't do them any good

3    because they can't prove he was a member of the conspiracy

4    because they can't prove Jennings didn't lie to him.

5           The other is this thing about aiding and abetting.

6    Was he aiding and abetting Jennings?  Well, he would only be

7    guilty under aiding and abetting if he knowingly participated

8    in the criminal activity and tried to make it succeed.

9           Well, he had to know about it, he had to be in on it,

10   Jennings couldn't be lying to him.  They failed to prove

11   Jennings wasn't lying to him.  This theory doesn't help them

12   either.

13          He's only guilty if he knew, and they can't prove that

14   he did, because they can't deal with the fact that the evidence

15   says Jennings was lying.

16          Now, for Counts 16 and 17.  All of this is money

17   laundering.  But to prove it, they have to show that he thinks

18   and believes and knows that it's proceeds of an unlawful

19   activity.  That's only going to be the case if he's in on it

20   and Jennings isn't lying to him.  So he's not going to think

21   it's proceeds of an unlawful activity if he's being lied to and

22   doesn't think he's doing something wrong.

23          Money laundering goes right along with the other

24   charges.  If they didn't prove Jennings wasn't lying to him,

25   he's not guilty of any of it, and that's the result.

Closing Argument - Mr. Brindley

1      Now, you have to look at all the evidence in the case.

2   There's certain arguments the government might make.  None of

3   the evidence proves actual bad intention, that he really

4   intended people to get medicine they weren't supposed to have.

5   None of them proves Jennings wasn't lying to him.

6      The government may say at the end, well -- when they

7   come back, we have to -- maybe there's problems with every

8   piece, maybe there's problems with the evidence about the

9   agents' statement, that -- that doesn't make a whole lot of

10   sense.  Maybe there's problems with other parts of the

11   evidence.  But when you put it all together, the whole picture

12   shows that he knew.

13      No, it does not, because looking at it all together,

14   you've got to look at that medical chart evidence.  That

15   suggests that he was being lied to.  And looking at it all

16   together doesn't change the fact that they haven't proved that

17   Jennings wasn't lying or the fact that we know Jennings was a

18   liar.

19      Reasonable inferences.  They're going to say, Well,

20   look, the doctor -- the fact that he claims that he didn't know

21   what was going on but there was this big number of pills and

22   there was this big number of money and he must -- he must have

23   known, he should have known, all of this, you can reasonably

24   infer.

25      Well, go back to that instruction you're going to get.

Closing Argument - Mr. Brindley

 1   You may not find he acted knowingly because he failed to
 2   investigate to discover the truth.
 3            MR. SCHNEIDER:  Objection to counsel paraphrasing a
 4   jury instruction.
 5            THE COURT:  Okay.  Sustained.
 6            Remember, I'm going to give you the law.  Just follow
 7   my instructions.
 8            You can continue.
 9            MR. BRINDLEY:  Okay.
10            So, Ladies and Gentlemen, the last part of that
11   instruction, we believe that the instruction that is going to
12   be given to you, the last part of it is going to say:  You may
13   not find that he acted knowingly if he failed to discover the
14   truth, failed to take actions to discover the truth, or that he
15   was careless.  And that's all that they've got.  They can't
16   say, "Oh, he should have known," because that drags them right
17   into the category of he failed to discover the truth evidence.
18   It just doesn't work.  These reasonable inference, that's not
19   substitutes for proof beyond a reasonable doubt.  There's no
20   instruction that you can infer a defendant's guilt.  They have
21   to prove it.  And the medical chart evidence stands as a direct
22   obstacle that will never let them get there.
23            When you start saying, Well, we might not have the
24   proof, but you should infer, it's not really there, but infer
25   this and infer that.

Closing Argument - Mr. Brindley

1    That wouldn't happen if there's proof beyond a
2  reasonable doubt.  Then you wouldn't need excuses.
3    What that really comes down to is, well, you should
4  think he must have known or he should have known, give us the
5  benefit of the doubt.  That's what that sounds like.  That's
6  what it comes down to.
7    But this is a criminal case.  When the doubt comes up
8  in a criminal case, the answer is not benefit to the
9  government.  The answer when the doubt comes up is not guilty.
10    MR. SCHNEIDER:  Objection to the definition of
11  reasonable doubt.
12    THE COURT:  Okay.  Overruled on that one.  I have a
13  different one, but ...
14    MR. BRINDLEY:  Now, it's easy to look at all of this
15  and become suspicious yourself, as a person looking at this
16  evidence, because Mikaitis was close to all of it.  They didn't
17  really prove that he wasn't being lied to.  The medical chart
18  evidence doesn't make sense, but he must have known something?
19  That's an easy thing to come to in your mind.  Might be guilty.
20    But, Ladies and Gentlemen, you're not going to be
21  instructed, you won't receive any instruction that it is
22  sufficient to prove that he might have done it, he could have
23  done it, he probably did it, none of that.
24    They had to prove beyond a reasonable doubt that he
25  knew, in other words, that he wasn't being lied to.

Closing Argument - Mr. Brindley

1      Suspicious isn't enough in a criminal case.  It's

2   proof beyond a reasonable doubt, and they don't have it.

3      A couple of ways to think about the evidence at the

4   end, and then I'll finally be done.  I know it takes a long

5   time.

6      A question to consider:  What specific piece of

7   evidence convincingly proves and provides confidence that

8   Mikaitis intended patients to get medicine without any

9   legitimate purpose or that he intended to defraud anybody?  Or,

10  in other words, what specific piece of evidence proves and

11  gives confidence Jennings wasn't lying to him?  Think about

12  that.  What specific piece?

13     And ultimately, Ladies and Gentlemen, you can't

14  identify one in this case.  In fact, the medical chart evidence

15  suggest the other lie.  It's a problem.

16     And when you can't identify the piece of evidence that

17  proves it with confidence, ask yourself, should someone be

18  found guilty of a crime when one can't identify the piece of

19  evidence that proves it?

20     I certainly hope you think the answer to that is "no"

21  in an American court.

22     Question to think about:  What piece of evidence

23  convincingly proves and gives confidence that Jennings wasn't

24  lying to Mikaitis?

25     This is the same thing.  There's no evidence, no piece

Closing Argument - Mr. Brindley

1    of evidence you can point to.

2              Should he be convicted if one can't identify that

3    piece of evidence?

4              The answer is no.

5              Question to consider:  Later on, Michael Jennings

6    admits at some point down the road that he lied to Mikaitis

7    about what happened and misled him about how the medicines were

8    being dispensed, would that surprise anybody?

9              MR. SCHNEIDER:  Objection.

10             THE COURT:  Sustained.

11             MR. BRINDLEY:  Ladies and Gentlemen, no one would be

12   surprised --

13             MR. SCHNEIDER:  I object to this line of argument.

14             MR. BRINDLEY:  Well --

15             MR. SCHNEIDER:  There's just no evidence in the record

16   to support --

17             MR. BRINDLEY:  I'm not saying there's evidence.

18   I'm -- it's an argument.

19             MR. SCHNEIDER:  Well --

20             THE COURT:  It's not based upon facts that have

21   been --

22             MR. BRINDLEY:  Okay.

23             THE COURT:  -- admitted into evidence --

24             MR. BRINDLEY:  Sure.

25             THE COURT:  -- so the objection is sustained --

Closing Argument - Mr. Brindley

1        MR. BRINDLEY:  Let me frame the --

2        THE COURT:  -- and remains sustained.

3        MR. BRINDLEY:  Let me frame the argument a different

4  way.

5        Would anybody be surprised to find out Jennings was

6  lying --

7        MR. SCHNEIDER:  I ask that the frame be taken down

8  because it represents evidence --

9        MR. BRINDLEY:  Oh, for -- give me a break.

10        MR. SCHNEIDER:  -- that wasn't even introduced in the

11  case.  It's misleading.

12        MR. BRINDLEY:  Judge, I'm moving forward.  Please.

13  I'm going to move ahead.

14        MR. SCHNEIDER:  Well --

15        THE COURT:  The objection remains sustained.

16        MR. BRINDLEY:  Okay.  I'm moving ahead.

17        THE COURT:  Okay?

18        MR. BRINDLEY:  Okay.

19        So the question to think about -- there's no evidence

20  about what Jennings would say.  But the question to think

21  about, would anybody be surprised if they found out that he

22  lied to Mikaitis?  No one would, based on what we've got.

23        And then the follow-up question to that is:  Think of

24  if you're presuming Dr. Mikaitis innocent, as you're required

25  to do, and you wouldn't be surprised to find out Jennings lied

Closing Argument - Mr. Brindley

1    to him, based on the medical chart evidence at least, can't

2    find him guilty.

3            One final way -- or one of the final ways to think

4    about this is if somebody had a relative or a neighbor, if a

5    person had a relative or a neighbor who was a doctor or like

6    Dr. Mikaitis, been a doctor for 30 years, he gets charged with

7    this crime, when there's evidence of this con man running

8    around and lying behind his back shows up in the medical

9    charts.  Would anybody think about a friend or relative,

10   neighbor or relative, who was in Dr. Mikaitis' position, would

11   anybody think that it was fair for him to be convicted?  No one

12   would.

13           MR. SCHNEIDER:  Objection.

14           MR. BRINDLEY:  And, Ladies and Gentlemen --

15           THE COURT:  It's sustained.

16           MR. SCHNEIDER:  Objection.

17           MR. BRINDLEY:  Ladies and Gentlemen, fairness requires

18   that Dr. Mikaitis be treated in the same way as anybody else,

19   and it wouldn't be fair to convict somebody under this

20   situation who is a doctor of 30 years, not William Mikaitis,

21   not a friend or relative, nobody.

22           MR. SCHNEIDER:  I object to --

23           THE COURT:  Sustained.

24           MR. BRINDLEY:  The simple question at the end, Ladies

25   and Gentlemen, is the question we asked at the beginning:  What

Closing Argument - Mr. Brindley

1   is more likely?  Doctor risks everything for money he doesn't

2   need?  Or a con man lies and takes advantage of an elderly

3   doctor who is careless and doesn't pay attention?

4           Ultimately, that's the question to answer, and I think

5   we've answered it through the course of this argument with the

6   evidence.

7           But when you get to that evaluation of the whole

8   thing, the big frame, who is William Mikaitis, it's been said

9   that character can be measured by what people say about you

10  when they don't have a motive to be your friend.  Vesta

11  Valuckaite was Dr. Mikaitis's former mistress.  He left her to

12  go back to his wife.  She got -- had to get immunity and

13  brought into court to testify in a federal case because of her

14  relationship with him.  What did she say about William Mikaitis

15  when she had the chance?  She said he was well-respected.  She

16  said he always expressed concern for the patients.  She never

17  knew him to put patients at risk while working for Results

18  Weight Loss, and that was inconsistent with everything she knew

19  about him.  That's what someone with a reason to dislike

20  William Mikaitis says about him, and that should matter, that

21  should tell you something, that should tell you William

22  Mikaitis wouldn't do this knowingly.  And that's evidence you

23  can consider in this case.

24          He might be old, he might be careless, but he never

25  had a bad intent toward patients.

Closing Argument - Mr. Brindley

1    And they didn't prove that he wasn't being lied to by

2    this man William Jennings -- Michael Jennings.

3    At the end, you will get a final instruction about

4    deliberations.  And, of course, not everyone is going to agree

5    with my analysis of the evidence, certainly, at the beginning,

6    but some of you will.  Some of you will see what the medical

7    charts show.  You'll see the problems.  You'll see the reasons

8    to doubt, which are undeniable.  They are there.  They can't be

9    taken away.  And you -- if you see those things, if you

10   understand, no matter what happens back in that jury room,

11   you'll be instructed you should not surrender your honest

12   beliefs, no matter what anybody says, no matter how much we

13   want to go home for the weekend.

14              MR. SCHNEIDER:  Object to counsel --

15              MR. BRINDLEY:  Do not surrender your honest --

16              MR. SCHNEIDER:  -- this line of argument at this

17   stage.

18              THE COURT:  Okay.  Sustained.

19              MR. BRINDLEY:  Ladies and Gentlemen, when you go back

20   there to consider the evidence, those of you who see that this

21   doubt exists, who see the problems in the medical charts and

22   know what it is, the only answer for you to give under the law

23   is not guilty.

24              The question whether you are willing to do that, that

25   means stand up to the government and say no, government, you

Closing Argument - Mr. Brindley

 1    didn't prove it in this case --

 2              MR. SCHNEIDER:  Objection.  There's nothing about

 3    standing up to the government.

 4              THE COURT:  That's sustained.

 5              MR. BRINDLEY:  Whether or not you're willing to make

 6    that decision, to follow the law and say that he's not guilty,

 7    whether you're willing to do that, that's a question that

 8    William Mikaitis and I have to leave up to you.

 9              I thank you for listening to me for so very long this

10    morning.

11              Thank you.

12              THE COURT:  Okay.  Ladies and Gentlemen, why don't you

13    take a short break, a washroom break, before we begin the

14    rebuttal, and I'll talk to the lawyers about a few matters.

15              COURT SECURITY OFFICER:  All rise.

16         (Jury out at 10:53 a.m.)

17              THE COURT:  Okay.  The rest of you can be seated, but

18    there are eight improper arguments that I've documented, seven

19    of which have been on sustained objections.

20              Please close the door.  You can come in, but you've

21    got to close the door.

22              All right.  Thanks.

23              And one which was not on -- I think there was two not

24    on objection.

25              The majority of them I think can be remedied in a

1    rebuttal argument by referring to the jury instructions that we

2    have jointly put together.

3            One I don't know about and probably needs a curative,

4    and I'll list all of them for you now.

5            The first one was that the prosecutors are going after

6    your client, Mr. Brindley --

7            MR. BRINDLEY:  Yes, Judge.

8            THE COURT:  -- to take away his livelihood.  That's a

9    motion *in limine*.  It's a jury nullification argument.  It's

10   improper conduct on the part of the prosecutors.  There's no

11   evidence of it, so that was a sustained objection.

12           The next, that the agents were deciding not to have

13   any proof of the statements.  It's suggestive of improper

14   activity on the part of the agents.  That's also a jury

15   nullification argument and improper.

16           The next one was that you should let him go home.

17   We -- you agreed to the motion *in limine* not to invoke any

18   potential incarceration.  Of course, letting him go home, the

19   inference is that we're locking him up if we don't.  That's

20   there.  It's reasonable inference to say if you don't vote for

21   me, he's not going home.

22           The next one was not objected to, but I think it was

23   the definition of burden of proof, was when you said that if

24   they find the medical chart in that way, that means reasonable

25   doubt, so that if you agree with me on this one piece of

1    evidence, that's reasonable doubt.  That was defining of

2    reasonable doubt.

3         The next one was that you put on the slide to the jury

4    that he had no bad intent toward patients and, therefore, you

5    can't convict.  Of course, there's no element of bad intent

6    towards patients.  It's not an element, so it was a

7    misstatement of the law, and I will give them that.

8         And then the overriding theme of im -- it was improper

9    that the government must prove that Jennings was not lying,

10   which, of course, is not the burden of proof in this case.

11        And then, finally, the last one, which was the

12   neighbor and relative, that's putting your shoes -- putting

13   yourself in the shoes of the defendant, which is an improper

14   argument in the Seventh Circuit and it invokes sympathy, which

15   they're going to have an instruction not to do.

16        All of those -- oh, one more.  Stand up to the

17   government is also an improper argument.  It's jury

18   nullification.  It's not for the burden of proof and reviewing

19   the evidence is to put the government in its place, and that's

20   improper.

21        The one that is improper that I think probably needs a

22   curative -- you have the tools to rebut these in the jury

23   instructions as far as what needs to be proved and that

24   Jennings -- proving that he's not lying is not part of the

25   case, you have those.

1          You have the proper -- you have the instruction about

2     incarceration and that they're not supposed to consider that.

3          You have the instruction about what they're supposed

4     to be relying on.

5          So I think most of those can be remedied.

6          The one that I'm not sure can be is the one regarding

7     the accountant.  And there was a bit of an effort to fix it; I

8     just don't think it was fixed entirely.

9          MR. BRINDLEY:  Judge, can I address that --

10          THE COURT:  Not yet.

11          MR. BRINDLEY:  There's a case on it --

12          THE COURT:  Not yet.

13          MR. BRINDLEY:  -- specifically.

14          THE COURT:  Not yet --

15          MR. BRINDLEY:  Okay.

16          THE COURT:  -- until I finish mine, and --

17          MR. BRINDLEY:  Okay, good.

18          THE COURT:  -- then I'll give you an opportunity, as I

19     always do.

20          MR. BRINDLEY:  You're right, Judge.  I'm --

21          THE COURT:  All right.  So this one, we have an

22     instruction that says you should not speculate why any other

23     person whose name you may have heard during the trial is not

24     currently on trial before you, and that will be certainly

25     helpful.

1          Another one that I think actually we don't have, which

2     is also a correct statement of the law that would be

3     beneficial, is the law does not require any party to call as a

4     witness every person who might have knowledge of the facts

5     related to this trial, and the law does not require either

6     party to present as exhibits all papers and things mentioned

7     during the trial is another one that might be helpful there.

8          The other opportunity, though, would be to say both

9     parties have subpoena power and may call which witnesses that

10    they choose to call, and then do this, and then, you know, you

11    can go from there.

12         There was an inference -- and I tagged it in the

13    transcript, and I'll read it to you -- oh, I think I lost my

14    tag.  Let's see.  No, here it is.

15         So this is how it played out.  It played out like

16    this:

17         "His taxes?  His accountant does his taxes, like lots

18    of professionals.  There's no proof he hid his income from his

19    accountant, none whatsoever.  There's no evidence from John

20    Deraimo saying, Hey, the guy is a liar, he didn't tell me about

21    that.  Why?  They subpoenaed every other person who has

22    anything to do with this case."

23         So right there, there was an objection, and that's

24    when you said:  "It's perfectly legitimate."

25         And then Mr. Schneider's objection was:  "Could have

1    called the accountant."

2            And that's what I didn't hear, which is why I said:

3    "What did you just say?"

4            And then I said maybe we'll do a curative instruction.

5            And then he went on to say:  "The bottom line, and

6    what I think he's getting exorcized about here, is the

7    defendant has subpoena power and we can call whatever witness

8    we want to call, right?  Yeah, we can.  We did.  We called the

9    witnesses who knew -- the witness who knew what happened,

10   Dr. Mikaitis, to tell his story, and look at the government,

11   say this is what happened.  If I'm lying, you prove it, bring

12   somebody in here.  Did they bring in John Deraimo to say

13   Mikaitis is a liar?  No.  Why?  He's not.  We don't need to

14   take -- call John Deraimo if we called Dr. Mikaitis, and we

15   know Dr., whatever his name, Dr. -- who won't contradict him.

16   They've got to prove the case."

17           That's how it played out.  Okay?

18           MR. SCHNEIDER:  Right.

19           THE COURT:  So it kind of played out where he fixed it

20   by saying we have subpoena power as well.

21           MR. SCHNEIDER:  But it didn't really fix it because --

22           THE COURT:  So the last line -- I mean, there's one

23   way of doing it, which is a combination, before you take your

24   position, is a combination of saying that you shouldn't

25   speculate as to why people who are not -- that are mentioned

1    are not part of the case.  The law doesn't require each party

2    to call as a witness every person.  Both sides have the ability

3    to subpoena witnesses that they believe they want to use in

4    their case.  And then say the ultimate decision is whether the

5    government has proved its burden beyond a reasonable doubt.

6    And then you'd have the ability to argue, you know, we don't

7    have an obligation -- it's not a missing witness instruction

8    that you can make an inference that he is going to testify

9    consistently with Mikaitis.  And that's why I sustained the

10   objection, because the first part of the argument was he's the

11   truth-teller, Deraimo is the liar, they didn't call him, so you

12   must assume he's a liar.  And that's a missing witness

13   instruction.

14              MR. BRINDLEY:  I understand, Judge.

15              MR. SCHNEIDER:  The further problem with that is that

16   that line across for the defendant was based on Federal Rule of

17   Evidence 608, just to show prior false statements or

18   dishonesty, and the rule states that that particular

19   impeachment cannot be established by extrinsic evidence, so I

20   have to take the witness's answer.  Counsel knows that.  He's a

21   clever fellow.  He knows the law.

22              So when he's arguing why didn't they call the

23   accountant, we couldn't, under the Federal Rules of Evidence,

24   because we can't prove up 608 impeachment by extrinsic

25   evidence.  So he's out there broadcasting that we're hiding the

1    ball when we're just following the law.

2         THE COURT:  Okay.

3         MR. BRINDLEY:  Judge, a couple of things.

4         One, I don't agree with that.  I think -- I thought

5    the cross-examination was to provide evidence that Dr. Mikaitis

6    was hiding the money and laundering the money because he wasn't

7    reporting it on his taxes.  I think they could have impeached

8    him with any evidence.  I don't think it's 608.  I think that's

9    not true.

10        But the main thing, this whole -- this exact argument

11   comes up in the case of *Sblendorio* in the Seventh Circuit --

12        THE COURT:  I'm familiar with it.

13        MR. BRINDLEY:  That's why I added the thing about we

14   have subpoena power, too.  I was trying to be within the

15   boundaries of *Sblendorio*.  I think we were, but I don't have

16   any problem with adding any of the instructions your Honor

17   wants to.  I think that's right.

18        THE COURT:  I think that -- I think an instruction is

19   needed here.

20        MR. BRINDLEY:  That's fine.

21        THE COURT:  And I don't know whether the government

22   agrees with me, but I think an instruction is needed here --

23        MR. SCHNEIDER:  Uh-hum.

24        THE COURT:  -- to correct the fact that there is a

25   potential argument here that because they didn't call him,

1    which is where that argument went, you can assume he would

2    testify consistent with what his client said.  That's the

3    missing witness.

4           MR. SCHNEIDER:  Right.

5           THE COURT:  So I'll put one together and -- which is a

6    combination of all these accurate statements of the law, and

7    I'll come out and give it to you in just a moment, and then I

8    think we'll add it to the packet.

9           MR. BRINDLEY:  Sure.

10          THE COURT:  But all of the other ones are the ones

11   that I pointed to and sustained objections on the majority.

12          So is there anything else that you believe needs to be

13   cured or are you within control of the jury instructions that

14   we have created and you'll use whatever you want to use in your

15   rebuttal?

16          MR. SCHNEIDER:  Yes, I believe that's true, Judge.

17          THE COURT:  So the agents' --

18          MR. SCHNEIDER:  Can we have a final set of the jury

19   instructions?  I know we added some yesterday.

20          THE COURT:  So the agents' --

21          MR. SCHNEIDER:  I --

22          THE COURT:  The agents' and the prosecutors'

23   misconduct argument, let him go home argument, the bad intent

24   toward patients argument, the neighbor/relatives argument, and

25   the stand up to the government argument, those are the ones

1   that I've highlighted.  And then the one burden of proof one,

2   which was that the chart is reasonable doubt.

3          I think you have the ability to use the instructions;

4   but if you are going through any of them now and you think

5   something else needs to be cured, let me know.

6          I'm going to take a short break, you can take a break

7   as well, and I'll come back in a minute.

8          LAW CLERK:  All rise.  Court is in recess.

9      (Recess taken from 11:04 a.m. to 11:16 a.m.)

10     (In open court outside the presence of the jury:)

11         THE COURT:  You can be seated.

12         Is there any objection to that?

13         MR. BRINDLEY:  No.

14         THE COURT:  It's an accurate statement of the law, so

15  I don't know if anyone -- do you agree with it?

16         MR. BRINDLEY:  We agree.

17         THE COURT:  Okay.

18         MR. SCHNEIDER:  I -- we agree.

19         The last sentence, Judge, is stated --

20         THE COURT:  Tell me.

21         MR. SCHNEIDER:  -- in other instructions that the jury

22  will receive.

23         There's no question, you know, what our duty is and

24  that, if --

25         THE COURT:  If you don't want it, that's fine.  I

1    mean, I thought it was -- that's fine.  I mean, I can take it
2    out.
3              MR. BRINDLEY:  Judge, I think it's better with that
4    line in there.  I think it's more complete.
5              THE COURT:  Well, what -- I think -- the reason I
6    added the last line was because the inference of the missing
7    witness is that this wasn't given to you, so you can assume
8    that what wasn't given to you is consistent with what we've
9    presented --
10             MR. SCHNEIDER:  Right.
11             THE COURT:  -- and that's not evidence before them.
12             So I thought the last line was, so you shouldn't be
13   concerned about what was not presented but just rather whether
14   they proved it.
15             MR. SCHNEIDER:  That's right.
16             THE COURT:  So to me, that was, like, the corrective
17   language.
18             MR. SCHNEIDER:  We agree.
19             THE COURT:  Is that fine with you?
20             MR. SCHNEIDER:  That -- that is fine.  We agree.
21             THE COURT:  Okay.
22             MR. SCHNEIDER:  We think it should be given.
23             THE COURT:  So what I'm going to do, I'll replace
24   Number 13 in the packet -- I'm sorry, Number 12 in the packet
25   with this.  Okay?

1            And then are you ready to go?

2            MR. SCHNEIDER:  We are.

3            THE COURT:  All right.

4            Can you bring my jury back in, please?

5            Thank you.

6            COURT SECURITY OFFICER:  All rise.

7        (Jury in at 11:19 a.m.)

8            THE COURT:  Okay, folks.  Please be seated.

9            You are in the homestretch.  Very last argument.  It's

10   the rebuttal argument by the government.

11           Mr. Schneider, you may proceed, sir.

12           MR. SCHNEIDER:  Thank you, your Honor.

13   REBUTTAL ARGUMENT BY MR. SCHNEIDER:

14           MR. SCHNEIDER:  Ladies and Gentlemen, yesterday the

15   defendant testified under oath that mailing drugs, mailing

16   controlled substances, would be against the law, yet the

17   evidence in this case shows that the defendant knew his

18   partner, Jennings, was shipping by U.P.S. controlled substances

19   to Results customers.

20           How?  How does the evidence show that?

21           Well, the defendant told Vesta at her apartment, at

22   her residence, after a phone conversations that he had with

23   Jennings.

24           Now, you remember this testimony.  Vesta was at her

25   home.  The defendant was there.  They were making dinner

Rebuttal Argument - Mr. Schneider

1   together.  The phone rings.  The defendant takes the call on

2   his cell phone.  It's Jennings on the other line.  They have a

3   conversation.  Afterwards, the defendant speaks to Vesta about

4   what the conversation was about, and the defendant told Vesta

5   that Jennings was mailing drugs from Results.

6        Now, that's the testimony of Vesta, somebody who came

7   here pursuant to subpoena, I submit.  This is someone who would

8   rather have been any other place in the world besides this

9   courtroom this week, but she was here.  She testified

10  truthfully and she testified honestly about this conversation

11  that shows the defendant's knowledge about this shipping of

12  drugs.

13       How else?  Anthony Sperando.  Jennings told Sperando

14  in early 2013 that he needed a doctor.

15       Why?  His previous doctor had lost his license.  So

16  Jennings is talking to Sperando, looking for a doctor.

17  Sperando can help.  He has one doctor in mind.  He goes to one

18  doctor.  That one doctor?  The defendant, William Mikaitis.  So

19  Sperando is the go-between between Jennings and Mikaitis.

20       And when Sperando returns to Results there on

21  Butterfield Road, he goes there from time to time to see

22  Jennings to collect his fee, and he sees drugs there.  He sees

23  mailers there.  He sees that Jennings is mailing drugs.  It's

24  evident to Sperando who is at Results' office.

25       But there's more.

Rebuttal Argument - Mr. Schneider

1           How else did the defendant know that Jennings was

2   mailing drugs?  Well, you heard from Parminder Singh.  She

3   worked at Results for all of two days in early 2014.  She saw

4   Jennings on the phone taking orders from customers of Results

5   for drugs to be shipped out.  And there were over 2,600

6   shipments by U.P.S. from 2013 to 2015.  Drug shipments were

7   being made all the time.  And the defendant said he was at

8   Results every week to pick up these envelopes and to see

9   Jennings.

10          So based on the defendant's own testimony here under

11  oath about mailing of drugs, mailing of controlled substances,

12  being against the law, being unlawful, if you find, as you

13  should, that he knew Jennings was mailing drugs from Results,

14  then your work as jurors is very straightforward in connection

15  with this case -- in connection with the drug counts, Counts 1

16  through 15, the drug conspiracy; the controlled substance

17  counts, 2 through 8; the charges under the Food, Drug and

18  Cosmetic Act, the misbranding counts, Counts 9 to 15 --

19  straightforward, the evidence shows the defendant is guilty as

20  charged because he agreed with Jennings to operate this illegal

21  drug business to make money, and a big part of the business was

22  mailing these drugs out by U.P.S. to people who never stepped

23  foot at Results Weight Loss.

24          What's more?  Defendant knew Jennings was dispensing

25  drugs at the office.  The defendant wasn't lied to.  He was in

Rebuttal Argument - Mr. Schneider

1    the know.  He was in on it.

2          And you know why?  No one else was there.  It was just

3    Jennings.  There was no other practitioner, right?  No other

4    doctor.  No other nurse practitioner, midlevel practitioner,

5    provider, who was on the scene dispensing drugs.  It was just

6    his partner, Michael Jennings.

7          Let's take Ms. Singh.  The defendant signed her

8    application to get a license to dispense controlled substances

9    at Results.  It was July 2013.  And there was a collaborative

10   agreement between the physician and the nurse practitioner for

11   that purpose.

12         But what else do we know?  We know he signed that

13   application, but he never met Ms. Singh, he never talked to

14   Ms. Singh, never interviewed Ms. Singh in connection with any

15   work that he was supposed to supervise.  How is that?  She

16   worked there two days, and that was enough for her.  She was

17   suspicious of Jennings.  She had Jennings' number.  She could

18   tell in that short period of time that he was a dodgy

19   character.  And she feared for her license, because she, too,

20   knew that mailing drugs, right?  By U.P.S. or by any other way

21   to people who don't even come into the office is unlawful.

22   It's against the law.

23         And then there's the defendant again who is there

24   every week for two years, seeing Jennings, and he claims he

25   didn't know.  How can that be?  It's just not believable.

Rebuttal Argument - Mr. Schneider

1          So we lawyers, we argue the law and we talk; but, you
2    know, at the end of the case, you, as jurors, decide the case
3    based on the evidence you heard, based on the law her Honor
4    will give you.  And in doing that you have the most important
5    role in the case, right?  But your most valuable tools are your
6    common sense and the good judgment you all develop through your
7    everyday experiences going through life.  And if you apply your
8    common sense to this evidence and evaluating the witnesses, you
9    will find that the defendant knew Jennings was mailing out
10   drugs by U.P.S. 2,600 times to customers who never came into
11   the clinic, without a legitimate medical purpose, because there
12   couldn't be a legitimate medical purpose.  If you're not seeing
13   the patient, if there's no face-to-face, you know what?  It was
14   a commercial transaction, right?  People picked up the phone,
15   they gave their credit card number, the drugs appeared in the
16   mail.  There was no medical evaluation.  This wasn't a
17   physician/patient thing.
18          Let's compare and contrast Ms. Singh and the defendant
19   for a minute.  She's a younger woman.  Not all that
20   experienced.  She's a nurse practitioner.  She's been at it for
21   a few years.  On the other hand, you have the defendant.  30
22   years of experience as a doctor.  He says -- says he has all
23   these accolades and recognitions.  And after two days, she
24   figured it out and she quit.  Meanwhile, the defendant is at it
25   for two years, partnering up with Jennings, and he is all in,

Rebuttal Argument - Mr. Schneider

1    all in for two years.

2           And what's the difference there between somebody like

3    Ms. Singh, who does the right thing, and the defendant, who is

4    all in?  $1,750 in cash a week.  That's 7 grand a month.  Over

5    the time of a year, it's $84,000.  Free cash for doing nothing.

6    And the defendant took the cash from Jennings and looked the

7    other way.

8           He sold his DEA registration number to get this money,

9    this cash money, and he put patients at risk, because that's

10   what this case is all about, right?  He put patients at risk

11   who were getting controlled substances without a legitimate

12   medical purpose.

13          Let's think about Denise Gomez.  She came and

14   testified.  She's from Arizona.  In 2014 she got two

15   prescriptions of phentermine, a controlled substance.  Pill

16   bottles arrived in the mail.  She just had to give her credit

17   card number over the phone.  Dr. Mikaitis' name is on the

18   prescription bottles.  She knew better.  She knew about the

19   side effects.  It affected her in an adverse way, but she still

20   wanted the drugs.  And Jennings, Mikaitis, Results provided

21   them.

22          How about Melanie Delguidice from Naperville?  She

23   testified when she went to her personal doctor and that doctor

24   would not prescribe her phentermine because she had high blood

25   pressure, but when she went to Results in '13 and '14, mostly

Rebuttal Argument - Mr. Schneider

1    just phoning it in, giving her credit card and getting drugs,

2    she received controlled substances.

3              Patients were put at risk.  And this case is about

4    that, and it's about the defendant's greed and the defendant's

5    indifference to others.  And counsel raises the question of who

6    is the defendant?  That's who he is.  He's a person who had

7    greed and was indifferent to the care and welfare of others.

8              Why?  Well, the motive is obvious, right?  $7,500 --

9    $7,000 a month, $84,000 a year.  And he used it to finance his

10   relationship with his girlfriend Vesta.  It was easy money.  He

11   didn't have to account for this money.  Didn't have to account

12   to this money to his wife because he put it in this side

13   account that he shared with Vesta.  He didn't have to pay taxes

14   on the money because he didn't report this income from

15   Jennings, from Results, on his 2013 or 2014 tax return.

16             MR. BRINDLEY:  Objection, Judge.  Misstates the facts

17   and evidence.

18             THE COURT:  Okay.  Again, so if you have a

19   disagreement with the way the lawyers are reviewing the

20   evidence, it's going to be your collective memory of the

21   evidence that prevails, not theirs.

22             You may proceed.

23             MR. SCHNEIDER:  So I submit to you the defendant is

24   cheating on his wife, he's cheating on his taxes, he's taking

25   this free money from Jennings, he's looking the other way,

Rebuttal Argument - Mr. Schneider

1    because he likes the money.  Can't go to the bank account he

2    shares with his wife to finance his relationship with Vesta.  I

3    mean, they have this joint account.  He can't pull funds from

4    there.  But the money from Jennings provides him with a way to

5    finance his relationship with Vesta.

6              And all of a sudden this morning we're hearing he's

7    careless, he's elderly, he's old.  Well, the evidence shows in

8    2013 and 2014 the defendant was quite on the ball, right?  He's

9    got this busy medical practice in Lockport, full-time practice

10   at Advocate.  He's seeing Vesta half the time.  He's married to

11   Violeta.  He's traveling all over the world -- with money

12   Jennings gave him -- with Vesta, to Lithuania, to Mexico a

13   couple times, to California, to Sedona, to Hawaii, to Vegas.

14   And on weekends?  Let's go to the boat in Michigan.

15             So a pattern emerges here.  You see the defendant is

16   blaming Jennings.  Jennings lied to me.  The accountant didn't

17   report my taxes.  The defendant is somebody who is blaming

18   others.  He's blaming Jennings.  He's blaming the accountant.

19   Jennings went behind my back.

20             The fact is Jennings couldn't have done what he did

21   without the defendant's knowledge, without his participation,

22   without his consent.

23             The defendant provided his DEA registration number,

24   his credit card number.  The defendant paid the bills, the drug

25   bills, that is.

Rebuttal Argument - Mr. Schneider

1      And that's what Count 16 is all about, right?  Because

2   the way they set it up, as long as Jennings reimbursed him for

3   the drugs and the defendant paid off those credit card charges,

4   the drugs kept coming.

5      So the financial transactions promoted the drug

6   business, kept the drug business coming.

7      Ms. Gilkerson put the cycle of money graph up

8   yesterday and explains exactly how this money laundering

9   conspiracy worked, because it only worked without -- with the

10  defendant's full and complete participation.

11     He said on the stand, if Jennings didn't reimburse me,

12  I'd cancel the card, and that would have been the end of it.

13     The review of these charts was a charade.  The

14  defendant would obviously sign anything, provide cover for

15  himself, provide cover for Jennings.

16     Joycelynn Evans, for example.  You look at that chart,

17  it's razor thin.  It's just a transaction log, a dispensing

18  log.  There's not enough information there to make a reasonable

19  decision with regard to medical care and the dispensing of

20  controlled substances.  It's just a commercial transaction log.

21     And yesterday morning the defendant admitted under

22  oath that dispensing drugs to Joycelynn Evans -- the thin woman

23  who came in here, she was an FDA agent -- was without a

24  legitimate medical purpose.

25     And then we broke for lunch.  Now, I don't know what

Rebuttal Argument - Mr. Schneider

1   the defendant ate for lunch, I don't know who he had his lunch

2   with --

3           MR. BRINDLEY:  Objection, Judge.

4           THE COURT:  I'm going to sustain the objection.

5           MR. SCHNEIDER:  All I know is when we came back from

6   lunch, he had a different story, didn't he?  All of a sudden,

7   he changed his story and he says:  Oh, that dispensing was

8   proper and with legitimate medical purpose.

9           And you cannot believe that story for a number of

10  reasons.  That testimony yesterday afternoon, his testimony was

11  ridiculous.  There's nothing in Joycelynn Evans' file to

12  justify the dispensing of controlled substances.  He was just

13  signing anything.

14          Well, for one thing, she was super thin and her body

15  mass index was 19.  Dr. Piotrowski said 30 is the number for

16  obesity.  If people have additional conditions, maybe 27 might

17  be an appropriate number.  But just that one benchmark itself

18  tells you that it was without a legitimate medical purpose, yet

19  he signed off on it.  And yesterday he's looking at these other

20  papers, these medical questionnaires, but there's no tests, no

21  physical examination, nothing of a substance to show that that

22  was dispensed with a legitimate medical purpose.

23          And, you know, that conduct is charged in the

24  indictment, I believe it's Counts 5 to Counts 12, controlled

25  substance count, and a misbranding count under the Food, Drug

Rebuttal Argument - Mr. Schneider

1    and Cosmetic Act.  And that's just one of many.  And it's also

2    evidence to show the conspiracy, the agreement between Jennings

3    and Mikaitis, to further this drug business.

4            Now, you've seen the text messages in the case, and

5    they've been talked about to you.

6            I want to talk about this one where Mikaitis tells

7    Jennings that better Vesta not know too much.

8            Defendant's explanation just doesn't make sense.  It

9    doesn't make sense.  He says he had a disagreement with Vesta

10   and he didn't want Vesta to know how much money he was getting

11   from Jennings.

12           But she's on the joint bank account.  The bank

13   statements come to her residence.  She had picked up envelopes

14   before.  She knows he's getting money from Jennings.  So

15   there's nothing to hide, nothing to conceal, nothing to keep

16   from her.  She already knows all that.

17           What he was concerned about was that Vesta had

18   researched the side effects of these drugs, she was concerned

19   about the side effects and the effects on people, she had

20   talked to him about it before.  And having been to Results on

21   prior occasions to pick up his cash envelopes for him, she saw

22   what was going on at Results.  She was there, met with

23   Jennings.  She has two eyes.  She can see what kind of

24   operation is going on there.  Jennings is the only one, and

25   controlled substances are being dispensed.

Rebuttal Argument - Mr. Schneider

1      The defendant told Jennings, "Hey, don't give Vesta

2  any information," because she was questioning him and

3  questioning his conduct and his activities at Results.

4      You know, with regard to Dr. Piotrowski, it just

5  wasn't a difference of opinion.  I mean, she said these drugs

6  are serious drugs.  They have powerful side effects, and

7  they're for the treatment of obesity.  They're not just for

8  anybody who wants them.  They're just not for somebody who is

9  trying to get fit.  And Results Weight Loss was not a

10  legitimate medical practice or office.

11      Again, the defendant is elderly, he's careless?  Well,

12  according to the staff at the office in Lockport, he's a pretty

13  sharp doctor.  He saw twice as many patients as the other

14  doctors.  He's very efficient and productive at Lockport.

15      MR. BRINDLEY:  Objection.  Misstates the evidence.

16  There was no evidence of that.

17      MR. SCHNEIDER:  Well --

18      THE COURT:  Okay.  Ladies and Gentlemen, same

19  instruction:  It's your evidence, you're the fact-finders, you

20  know what to find.

21      And you can move on.

22      MR. SCHNEIDER:  Thank you.

23      I'm referring to Michelle Debeikis, I'm referring to

24  Debra Cap, the two ladies, the staff people from the Lockport

25  office who worked with the defendant every day, knew his hours,

Rebuttal Argument - Mr. Schneider

1  knew how hard he worked there, how many patients he worked

2  there, and were in a position to testify, you know, this was

3  somebody on the ball, a sharp guy who was working efficiently

4  at Lockport, and also had this side thing with Jennings so he

5  could get money so he could have a life with Vesta.

6            Elderly and careless?  No.

7            And look at the texts.  He's hands on.  He's texting

8  Jennings all the time, right?  There's constant communications.

9  Count the texts.  They start in August of 2013.  They go to

10 January 2015.  I think there's 70-some texts or something like

11 that.  You know, he's on top of things at Results.  He's in

12 communication with Jennings all the time.  He knows what

13 Jennings is doing.

14           And what are the communications about?  Make the

15 deposit.  Make the deposit.  I'll come by for the envelope.

16           And there's also messages where he knows Jennings is

17 seeing patients.  Jennings is talking:  I'm working late, got

18 some more people to see.  That sort of thing.  He knows what's

19 going on.

20           And they say he didn't pay attention?  The text

21 messages show otherwise.  He paid attention.  He knew.  He paid

22 the bills.  He was after Jennings for payment.  He wanted his

23 money for his DER -- DEA number.  He wanted reimbursement for

24 the drugs.

25           And how about the drugs?  530,000 pills?  That's a

Rebuttal Argument - Mr. Schneider

1    lot, right?  I mean, it was established that if you talk about
2    a 30-pill prescription bottle being a one-month supply, that's
3    about 17,500 prescription bottles.  And he was paying for them.
4    And he micromanaged the bills and the payments to A.F. Hauser,
5    so he knew how much it was.  It was the defendant who was
6    paying those bills.
7              $84,000 in invoices, and he paid those off.
8              And yet, you know, the defense boils down to, you
9    know, Jennings went behind his back, Jennings was lying to him.
10             Well, for one thing, you'll receive instructions from
11   the judge, and there won't be any element of any charge, all
12   right, that will show you or ask you to determine whether or
13   not Jennings was lying.  We don't have to prove that Jennings
14   was lying to the defendant.  It's clear that he was in on this
15   scheme, that he participated in the scheme, but that's not the
16   element of any offense.
17             And with regard to all these other people that may
18   have been mentioned, I believe the judge will instruct you that
19   you should not speculate why any other person whose name you
20   may have heard during the trial is not currently on trial
21   before you.
22             And, you know, with regard to these proceedings, I
23   also believe the judge will instruct you that in deciding your
24   verdict, you should not consider any possible punishment that
25   the defendant who is on trial may receive.

Rebuttal Argument - Mr. Schneider

1        You know, the defendant gave a statement on January

2    21st, 2015, to Investigator Kasza.

3        Let's compare the defendant's testimony to

4    Investigator Kasza's testimony.

5        Investigator Kasza was professional.  She was

6    straightforward.  She was direct in her testimony and her

7    answering questions.

8        In her encounter with the defendant on January 21st,

9    there was no possibility for confusion or mistake.  The

10   questions were straightforward.  They were direct.  They were

11   simple.

12       Dr. Mikaitis, what do you do here at Results?

13       Well, I work here at the hours shown on the business

14   card.  Six days a week, I see patients here.

15       They weren't talking about Lockport.  This spin that

16   they put on it that he was talking about seeing eight or ten

17   patients at Lockport in this particular conversation doesn't

18   wash.  They were talking about Results.  He said I see eight or

19   ten patients here.  I do a face-to-face.  They get a full

20   work-up.  They get tests.  They get a metabolic panel, which I

21   guess is blood work.  And those things happen.  And for

22   refills, I see 99 percent of the patients.  You know, that's

23   what he is telling her.

24       And, you know, all this business about I see patients

25   and I also sign charts being inconsistent?  What's

Rebuttal Argument - Mr. Schneider

1   contradictory about that?  A doctor sees a patient, he makes a

2   chart, he signs off.  There's nothing unusual about that.

3   Signs the charts he makes, and makes a notation, maybe as to

4   his orders or as to his observations.  So he's telling

5   Investigator Kasza that day I see eight to ten patients at

6   Results, and I sign the charts.  It's totally consistent.

7           Now, what we know is the defendant and Jennings said

8   the same thing to Investigator Kasza on that same day, January

9   21st.  They both lied to her.  They both made false statements

10  with the way Mikaitis operated at Results Weight Loss.  They

11  got their stories together.  They wanted to put off the DEA.

12  They wanted to conceal what they were doing, because they said

13  the same thing, and they misled the investigators.

14          So in terms of the instructions that talk about intent

15  to mislead or defraud, there you have it.  Not only were they

16  defrauding patients or customers who came there and thought

17  that they were really seeing a doctor when they were seeing the

18  defendant's partner, Michael Jennings, they actively deceived

19  the DEA on January 21st by lying to Investigator Kasza, by

20  getting their stories together and saying Mikaitis is the

21  doctor, I'm here six days a week, here are the business hours,

22  I see patients face-to-face.

23          The only contradiction with regard to that is in the

24  creative mind of the defense.

25          And the next day --

Rebuttal Argument - Mr. Schneider

1          MR. BRINDLEY:  Judge, I object to that.  The agent
2     testified there was a contradiction.
3          THE COURT:  Oh, to the evidence --
4          MR. BRINDLEY:  I object.  He said it was only in the
5     defendant's mind.
6          THE COURT:  Okay.  All right.  I'm going to sustain
7     the objection on the last phrase.
8          MR. SCHNEIDER:  Now, there's a question with regard to
9     whether this was recorded or put down in some way.  It was a
10    consensual conversation.  The doctor signed off on a consent.
11    It was an inspection.  There was a brief conversation.  He was
12    asked direct questions.  He voluntarily gave direct answers.
13    If he lied, that's on him.  He deliberately chose to lie to
14    conceal and -- his -- and cover up his dealings with Michael
15    Jennings.
16         And the next day, where is he?  Well, of course he's
17    at his real job, his real job in Lockport, where he actually
18    did have full-time hours.  And they find him there and he says:
19    Yeah, Jennings sees people at Results Weight Loss, and I get
20    paid money by Jennings.  With that, he finally came clean.  And
21    at the end of that, he surrendered his DEA registration number
22    for cause.
23         We respectfully submit to you, Ladies and Gentlemen,
24    that the evidence in this case shows beyond a reasonable doubt
25    that the defendant agreed with Michael Jennings to conduct this

Rebuttal Argument - Mr. Schneider

1    illegal drug business at Results Weight Loss, conspired with

2    him as charged in Count 1.

3            Together they participated in the unlawful

4    distribution of controlled substances and misbranded drugs, as

5    charged in Counts 2 through 8 and Counts 9 through 15.

6            And that at the heart of their activity was this

7    conspiracy to promote the drug business through this scheme of

8    Jennings reimbursing Mikaitis for the drug charges and Mikaitis

9    paying for the drug charges, which in turn provided more drugs

10   for Jennings to distribute through the mails and at Results.

11           And, lastly, Count 17, this whole scheme provided

12   Mikaitis with easy money, money for doing nothing, for spending

13   on Vesta. Again, he couldn't use his wife's joint bank

14   account, right? But he had this account to use, to go to

15   Europe, to go to the Bahamas, and to buy her a Mercedes. And

16   it was $12,000 in proceeds from this unlawful drug business,

17   this money for nothing that he got, that he applied for the

18   down-payment for that Mercedes automobile. And that's what

19   Count 17 is all about. Money laundering account charged with

20   the use of more than $10,000 in drug proceeds, unlawful

21   proceeds, from this activity to buy his girlfriend a fancy car.

22           The evidence shows beyond a reasonable doubt the

23   defendant is guilty as charged in the indictment.

24           Thank you.

25       (End of excerpt.)

Rebuttal Argument - Mr. Schneider

1      (Further proceedings were reported but not transcribed at

2      this time.)

3                    C E R T I F I C A T E

4      I certify that the foregoing is a correct transcript of the

5  EXCERPT of proceedings in the above-entitled matter.

6

7

  /s/ GAYLE A. McGUIGAN                    September 27, 2017
8  Gayle A. McGuigan, CSR, RMR, CRR                  Date
   Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25