UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 16 CR 361-2 |
| | ) | |
| V. | ) | |
| | ) | Judge Virginia M. Kendall |
| | ) | |
| WILLIAM MIKAITIS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
FOR A NEW TRIAL OR JUDGMENT OF ACQUITTAL**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, Jr., United States Attorney for the Northern District of Illinois, respectfully submits the following response to defendant's Motion for a New Trial or Judgment of Acquittal.

## BACKGROUND

On September 5, 2017, the jury in this case found defendant William Mikaitis guilty as charged of the following offenses in the superseding indictment: conspiracy to distribute a controlled substance outside the usual course of professional practice and without a legitimate medical purpose, in violation of Title 21, United States Code, Section 846 (Count One); distribution of a controlled substance outside the usual course of professional practice and without a legitimate medical purpose, in violation of Title 21, United States Code, Section 841(a) (Counts Two through Eight); dispensing prescription drugs without a valid prescription, in violation of Title 21, United States Code, Sections 353(b)(1), 331(k), 333(a)(2) and Title 18, United States Code, Section 2 (Counts Nine through Fifteen); conspiracy to conduct financial transactions with drug proceeds to promote unlawful activity, in violation of Title 18,

United States Code, Section 1956(h) (Count Sixteen); and engaging in a monetary transaction involving criminally derived property having a value greater than $10,000, in violation of Title 18, United States Code, Section 1957.

Defendant Mikaitis has filed a motion for judgement of acquittal pursuant to Rule 29, or in the alternative, a new trial pursuant to Rule 33. For the reasons stated below, the government submits that Defendant's post-trial motion should be denied.

## ARGUMENT

**I. THE GOVERNMENT PRESENTED SUFFICIENT EVIDENCE AT TRIAL FROM WHICH A JURY COULD REASONABLY FIND DEFENDANT GUILTY OF ALL CHARGES BEYOND A REASONABLE DOUBT**

**A. Legal Standard for a Motion Brought Pursuant to Rule 29**

A defendant challenging the sufficiency of the evidence under Federal Rule of Criminal Procedure 29 "bears a heavy, indeed, nearly insurmountable burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). The Court must view the evidence in the light most favorable to the prosecution, and the defendant must establish that, even in that light, "no rational trier of fact could have found him guilty beyond a reasonable doubt." *Warren* at 546 (quoting *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) (internal quotations omitted). It is appropriate to set aside a jury's verdict "only if the record contains no evidence, regardless of how it is weighed, from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (quoting *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008) (internal quotations omitted). In ruling on the motion, the Court does not make credibility determinations or reweigh the evidence, and "if there is a reasonable

2

basis in the record for the verdict, it must stand." *United States v. Moshari*, 858 F.3d 1077, 1081 (7th Cir. 2017).

      **B.**    **There Was Sufficient Evidence From Which a Jury Could Reasonably Find Defendant Knew, or Deliberately Avoided Knowing, that Controlled Substances Were Being Dispensed Without a Legitimate Medical Purpose**

The evidence showed beyond a reasonable doubt that Defendant knew Michael Jennings was dispensing controlled substances outside the usual course of professional practice and without a legitimate medical purpose. Defendant's motion ignores the testimony of Dr. Theresa Piotrowski, an expert in the treatment of obesity. After reviewing materials in the case, Dr. Piotrowski testified that she believed that Results Weight Loss Clinic (Results) was not a "legitimate medical practice." (Piotrowski Tr. 20:11-17.) She testified that there was no documentation that patients were evaluated prior to being dispensed medication. (*Id.*) Based on the case records she reviewed, patients were not given a physical examination or any laboratory tests before receiving controlled substances. (Piotrowski Tr. 21:7-16.) She reviewed patient charts and determined that patients who did not meet criteria for receiving prescription diet medication were dispensed controlled substances such as phentermine. (Piotrowski Tr. 22:20-23:1.) In her opinion, Results dispensed controlled substances outside the usual course of professional practice and without a legitimate medical purpose. (Piotrowski Tr. 25:20-26:3.)

The evidence showed that Defendant was aware that patients at Results were being dispensed controlled substances outside the usual course of professional practice and without a legitimate medical purpose. Defendant received text messages

3

from Jennings indicating that Jennings, who Defendant knew was not a doctor or nurse practitioner, was seeing patients at Results. For example, on May 2, 2014, Jennings texted Defendant, "I was here [at Results] late yesterday with last-minute new patients." Gov't Ex. Mikaitis Text Messages. On July 19, 2014, Jennings texted Defendant, "I got extremely busy these last couple of days. It's probably because of the week I'm not in the office next Saturday, everybody's getting in early. I'm finishing up with a couple of more people." *Id*. These text messages showed that Defendant was aware that it was Jennings who was seeing patients and dispensing controlled substances at Results.

Defendant was also aware that Jennings was mailing controlled substances to patients. DEA Investigator Anita Kasza testified that Defendant admitted that he was aware that Jennings may have been sending refills to patients through the mail. (Kasza Tr. 21:11-14.) Vesta Valuckaite testified that Defendant told her in her apartment that Jennings was mailing drugs to patients. Indeed, the government's proof at trial showed that approximately 2,700 packages of drugs were mailed to Results' patients during Mikaitis' two-year partnership with Jennings. Dr. Piotrowski found this practice particularly problematic, not only because it is illegal to mail controlled substances to patients, but also because there was no monitoring of the patient to ensure the patient was responding appropriately to the medication. (Piotrowski Tr. 25:2-14.)

Text messages between Defendant and Jennings showed that Defendant kept track of the day-to-day operations at Results. He consistently reminded Jennings to

4

make deposits to Defendant's bank account for the cost of controlled substances ordered with his DEA registration using Defendant's credit card. Jennings used Results' sales proceeds to reimburse Defendant for the cost of the controlled substances. Defendant was reimbursed approximately $84,000 for nearly 530,000 controlled substance pills ordered for distribution at Results. Defendant also made sure Jennings provided him with his weekly cash payments. Defendant's close monitoring of Jennings' activities is further evidence that he was aware that Jennings was seeing patients and dispensing controlled substances.

Defendant's knowledge of Jennings' illegal activity at Results was further evidenced by Defendant's attempts to keep his involvement with Jennings secret. Defendant only accepted cash payments from Jennings and directed Jennings to make deposits to a separate bank account he shared with his friend Vesta Valuckaite. Defendant also failed to report his income from Results on his federal income tax returns. Additionally, Defendant made it clear to Jennings that he did not want Valuckaite to know anything about how Results operated. On one occasion, before Valuckaite's arrival at Results to pick up Defendant's weekly cash payment from Jennings, Defendant cautioned Jennings not "to give her any info." Gov't Ex. Mikaitis Text Messages. According to Defendant, "it was better if [Valuckaite] knows very little." *Id.*

Defendant argues that Jennings misled him by not showing him all the patient charts at Results. According to Defendant, "he signed off on charts after reviewing them when asked to do so by Jennings, directly indicating that his belief that those

5

patients had a legitimate medical purpose for receiving the medications." Mot. at 3. However, Defendant testified that he signed off on Jocelyn Evans' chart, whose body mass index (BMI) was just 19.1, well below the medical standard for prescribing medication. According to Dr. Piotrowksi, Evans did not meet "any criteria to be put on weight loss medication." (Piotrowski Tr. 23:14-25; 24:1-3.) Defendant admitted on cross-examination that Evans was dispensed controlled substances without a legitimate medical purpose.[1] (Mikaitis Tr. 75:3-11.) Nevertheless, Defendant approved Evans' treatment at Results. Thus, even if the jury credited his testimony that he wasn't shown every patient chart, he knew from his review of Evans' patient chart that controlled substances were being distributed to individuals who weren't qualified to receive the prescription diet medication.

Defendant's alleged ignorance of Jennings' dealings at Results is in sharp contrast to nurse practitioner Paraminder Singh, who stopped working at Results after just two days after she observed Jennings taking phone orders for drugs to be mailed to patients. Singh feared that she would lose her license if she continued to work at Results.

In his motion, Defendant mistakenly argues that "outside the scope of professional practice" and "not for a legitimate medical purpose" are two separate elements that the government must prove in its case. Mot. at 2-3. The courts, however, have recognized that these two phrases are different ways of expressing the

---

[1] On redirect examination, Defendant reversed course and declared that there actually was a "legitimate purpose" for Evans to receive medication. (Mikaitis Tr. 110:5-13.)

6

same concept. In *United States v. Nelson*, 383 F.3d 1227 (10th Cir. 2004), the court noted that a "practitioner has unlawfully distributed a controlled substance if she prescribes the substance either outside the usual course of medical practice *or* without a legitimate medical purpose." *Id.* at 1231-32 (emphasis added). The court further observed that it "is difficult to imagine circumstances in which a practitioner could have prescribed controlled substances within the usual course of medical practice but without a legitimate medical purpose. Similarly, it is difficult to imagine circumstances in which a practitioner could have prescribed controlled substances with a legitimate medical purpose and yet be outside the usual course of medical practice." *Id.*; *see also United States v. Norris*, 780 F.2d 1207, 1209 (5th Cir. 1986) (same); *United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993) (allegation in indictment that distributions were "not . . . for a legitimate medical purpose" satisfied requirement that activities fell outside boundaries of professional practice). *United States v. Kirk*, 584 F.2d 773, 784 (6th Cir. 1978) ( "[T]here is no difference in the meanings of the statutory phrase, 'In the usual course of professional practice' and the regulations' phrase, 'legitimate medical purpose.'"). Defendant also mistakenly argues that he could not be guilty of the charges if he "subjectively believed that the medication was being distributed for a legitimate medical purpose." Mot. at 5. This argument ignores settled law that a physician's conduct must be evaluated "from an objective standpoint whether the drugs were dispensed in the usual course of professional practice." *Norris,* 780 F.2d at 1209; *see also United States v. Vamos*, 797 F.2d 1146 (2d Cir. 1986) ("The term 'professional practice' refers to generally accepted

7

medical practice; a practitioner is not free deliberately to disregard prevailing standards of treatment."). These rulings are consistent with the Supreme Court's decision in *United States v. Moore*, which approved a national standard of care. 423 U.S. 122, 136 (1975).

Thus, the evidence presented at trial was more than sufficient to sustain Defendant's convictions for drug and money laundering offenses. Defendant's motion for judgment of acquittal should be denied.

## II. THE GOVERNMENT PRESENTED SUFFICIENT EVIDENCE OF DELIBERATE AVOIDANCE TO SUPPORT GIVING THE OSTRICH INSTRUCTION

### A. Legal Standard for a Motion Brought Pursuant to Rule 33

Rule 33 of the Federal Rules of Criminal Procedure provides that "the court may vacate a judgment and grant a new trial if the interests of justice so require." Fed. R. Crim. P. 33(a). Rule 33 motions are not to be granted lightly, but are rather reserved for "situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (internal quotations omitted).

### B. The Court's Decision to Instruct the Jury on the Concept of Deliberate Avoidance Does Not Warrant a New Trial

Defendant is not entitled to a new trial based on the Court's inclusion of the "ostrich instruction" in its jury instructions. It was appropriate for the Court to instruct the jury on the concept of deliberate avoidance because Defendant claimed, as his defense, a lack of guilty knowledge, and the government presented evidence that defendant deliberately avoided learning the truth. *See United States v. Pabey*,

8

664 F.3d 1084, 1092 (7th Cir. 2011) (explaining that ostrich instruction appropriately given when "(1) a defendant claims a lack of guilty knowledge and (2) the government presents evidence that suggests that the defendant deliberately avoided the truth") (internal quotations omitted). In his motion for a new trial, Defendant does not dispute that he claimed a lack of guilty knowledge at trial. Nor does he take issue with the formulation of the instruction, which is nearly identical to the pattern Seventh Circuit jury instruction.[2] Rather, he argues that the government did not present sufficient evidence that Defendant deliberately avoided learning the truth about Jennings' illegal operation at Results Weight Loss Clinic. Defendant's motion should be denied because the government presented evidence that defendant deliberately avoided the truth by engaging in both physical and psychological avoidance over the course of his business partnership with Jennings.

    1.  Defendant Took Physical Actions to Avoid Learning the Truth About Results Weight Loss Clinic

At trial, the government presented evidence that Defendant avoided learning that Jennings' was seeing patients and illegally dispensing controlled substances at

---

[2] The instruction read, "A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said. You may find that the defendant acted knowingly if you find beyond a reasonable doubt that he had a strong suspicion that Michael Jennings was distributing controlled substances outside the usual course of professional practice and without a legitimate medical purpose and that he *deliberately took actions to avoid the truth*. You may not find that the defendant acted knowingly if he was merely mistaken or careless in not discovering the truth, or if he failed to make an effort to discover the truth." (Docket Entry 83 at 32 (emphasis added).) The Court modified the pattern instruction with the emphasized language so that it would be exceedingly clear to the jury that "they have to find actions," rather than mere negligence or carelessness. (Jury Instructions Conference Tr. 13:8-18.)

Results Weight Loss Clinic though physical acts. Evidence indicating deliberate avoidance may consist of "overt, physical acts" by which the defendant makes a physical effort to deliberately avoid gaining knowledge of the charged criminal conduct. *United States v. Craig*, 178 F.3d 891, 896 (7th Cir. 1999) (internal quotations omitted). Absenting oneself from the scene where the criminal activity is occurring in order to insulate oneself from the criminal activity is a form of physical avoidance, as is purposefully looking the other way to avoid seeing something that might confirm one's suspicions. *United States v. Diaz*, 864 F.2d 544, 550 (7th Cir. 1988) (ostrich instruction properly given where defendant, a drug trafficker, sought "to insulate himself from the actual drug transaction so that he could deny knowledge of it" by absenting himself from the scene of the drug delivery or fussing under the hood of his car so as to not see criminal activity happening nearby).

Here, Defendant attempted to insulate himself from Jennings' criminal activity by absenting himself from Results Weight Loss Clinic. Defendant testified that he did not see patients at the clinic and only visited the clinic to pick up his weekly cash payment and review a small number of patient files. (Mikaitis Tr. 24:15-18; 49:20-21.) When he made these brief visits, he entered through the clinic's side door. (Mikaitis Tr. 94:17-18.) By entering through the side door rather than the front entrance, Defendant avoided seeing what was happening in the front of the office, which was where the patient files were kept and where the controlled substances were dispensed. (Mikaitis Tr. 77:10-25; 94:19-21.) Upon entering the clinic, he made sure to go straight to Jennings' office: "I went right to Mr. Jennings' office, and I didn't

look anywhere in the clinic." (Mikaitis Tr. 49:24-25.) By absenting himself from the clinic except for a brief visit once a week, making a concerted effort not to look around the clinic outside of Jennings' office, and purposefully avoiding the front of the clinic, Defendant engaged in physical actions aimed at avoiding seeing something that might confirm his suspicions that Jennings was illegally dispensing controlled substances. Given this evidence of physical avoidance, it was appropriate for the Court to provide the jury with the ostrich instruction.

As further evidence that Defendant's behavior constituted deliberate avoidance, Parminder Singh testified that after just two days working in the clinic, it was clear to her that Results was not a legitimate medical clinic. She described Jennings as evasive and noticed almost immediately that he was preparing controlled substances for shipment through the mail, which she knew to be illegal. She left after her second day on the job because she was afraid she might lose her license if she continued to work at the clinic. Defendant, on the other hand, was so careful to avoid seeing what was happening at the clinic that he didn't (he claims) observe at any point during any of his weekly clinic visits, over an almost-two year period, anything suspect. *See United States v. Leahy*, 464 F.3d 773, 796-97 (7th Cir. 2006) (finding evidence of deliberate avoidance from contrast in company's long-standing insurance broker's claimed ignorance of fraud and another insurance broker's immediate identification of suspect accounting irregularities).

11

### 2. Defendant Also Engaged in Psychological Avoidance

In addition to physical acts of avoidance, the government presented evidence of psychological avoidance. Psychological avoidance consists of evidence of a "mental act—a cutting off of one's normal curiosity by an effort of will" to avoid confirming one's suspicions. *United States v. Ramirez*, 574 F.3d 869, 877 (7th Cir. 2009) (internal quotations omitted). The focus "is on what the defendant knew"—in other words, "given what the defendant knew, it would be permissible for a jury to conclude that the defendant strongly suspected involvement in illegal activity, but purposely avoided finding out for sure." *United States v. Carrillo*, 435 F.3d 767, 781 (7th Cir. 2006). In his motion, Defendant argues that after *United States v. Macias*, the government cannot rely on evidence of psychological avoidance to support an ostrich instruction. 786 F.3d 1060 (7th Cir. 2015). Defendant overstates the holding in *Macias*. While the Seventh Circuit criticized use of the phrase "cutting off . . . one's normal curiosity by an effort of will," *id.* at 1063, it did not overturn long-standing Seventh Circuit precedent that deliberate avoidance can be established either by overt physical acts or by psychological avoidance. *Id.* at 1063-64; *see also United States v. Chogsom*, No. 16-cr-174, 2017 WL 4467467, at *8 (N.D. Ill. Oct. 6, 2017) (citing to *United States v. Pabey*, post-*Macias*, for the proposition that deliberate avoidance can be established by showing "overt physical acts" or "purely psychological avoidance"). Indeed, in *Macias*, the Seventh Circuit contemplates "circumstances in which the failure to ask questions is unnatural—a ducking of responsibility, a violation of duty, and perhaps therefore the equivalent of taking evasive action to

12

avoid confirming one's suspicions." *Macias*, 786 F.3d at 1063.

Here, the circumstances surrounding Defendant's association with Results Weight Loss Clinic make Defendant's failure to ask questions unnatural. Defendant testified that he was recruited to work at Results Weight Loss Clinic by a pharmaceutical representative who informed Defendant that Jennings was looking for a doctor for his weight loss clinic. (Mikaitis Tr. 10:3-17.) When Defendant met with Jennings, Defendant was not asked to treat patients at the clinic, but was instead instructed to procure a DEA registration number so that Jennings, who was not a doctor and had no medical training, could purchase controlled substances to dispense to clinic patients. (Mikaitis Tr. 11:9-13; 12:12-15; 13:18-20.) The arrangement, according to Defendant, was that patients would come to Results and be seen by a nurse, but would not be dispensed any medication by Jennings until after Defendant had an opportunity to review their charts, which Defendant did about once a week. (Mikaitis Tr. 25:3-9; 76:19-23.) For almost two years, Defendant received an envelope containing approximately $1,750 in cash each week from Jennings just for stopping by to initial somewhere between four and eight patient charts. (Mikaitis Tr. 24:17-18; 66:1-3; 67:1-5; 124:19-25.) Defendant did not know who was preparing the charts and never saw a nurse practitioner at Results. (Mikaitis Tr. 50:22-25; 20:25-124:7) During this time, despite the small number of patient charts Defendant received to review, Defendant's credit card statements reflected thousands of dollars in charges each month for controlled substances Jennings purchased for the clinic. (Mikaitis Tr. 65:14-19.) These circumstances provide sufficient evidence for the

13

jury to infer that Defendant, an experienced doctor with a thriving practice at a legitimate medical clinic, was suspicious that Jennings was seeing patients and dispensing controlled substances without Defendant's authorization, but purposely avoided finding out for sure. *See Carrillo*, 435 F.3d at 781 ("[T]he circumstances surrounding the defendant alone can be sufficient to allow the jury to infer that the defendant was suspicious but deliberately cut off his or her curiosity in an effort to remain ignorant of guilty knowledge.").

Defendant's exposure to numerous red flags over the course of his two-year partnership with Jennings is also evidence of psychological avoidance. *See Leahy*, 464 F.3d at 796 (ignoring red flags and failing to ask questions that would "certainly arise from the circumstances" is evidence of deliberate avoidance). Angelo Sperando testified that he told Defendant that Jennings was looking for a new doctor because the doctor with whom he had previously partnered at Results lost his license. (Sperando Tr. 10:6-10.) This did not dissuade Defendant from working with Jennings. When Jennings stated that Defendant would be paid in cash, rather than by check or direct deposit, Defendant did not question Jennings' payment preference. (Mikaitis Tr. 79:24-80:17.) Neither did he question why Jennings, who had no medical training, was operating a medical clinic and managing its day-to-day operations, including ordering and dispensing controlled substances for the clinic. (Mikaitis Tr. 45:10-46:25.) Defendant did not express concern when Jennings used his DEA registration number to ship controlled substances to Advocate for use at Results Weight Loss Clinic, which Defendant knew to be a violation of DEA regulations. (Mikaitis Tr.

14

59:5-8; 60:12-61:2.) In the face of all of these red flags, Defendant's failure to ask Jennings any questions is strong evidence that Defendant was purposefully avoiding the answers. This is particularly true given Defendant's role as the DEA registrant and sole prescribing doctor at Results Weight Loss Clinic, as he was ultimately responsible for all of the controlled substances dispensed at Results. (*See* Kasza Tr. 18:21-24.) This evidence of psychological avoidance provides further support for the Court's decision to give the ostrich instruction. Thus, Defendant's motion for a new trial should be denied.

### III. THE COURT DID NOT UNDULY LIMIT DEFENDANT'S CLOSING ARGUMENT

Lastly, Defendant makes a general argument that the Court erroneously limited his closing argument. In doing so, Defendant failed to develop this argument by citing any specific instances where his argument was unduly curtailed. Instead, at most, Defendant makes vague mention that he was unable "to present his best arguments to the jury." Mot. at 10. On the contrary, the record shows that the Court's rulings were correct, and Defendant was allowed to make a comprehensive argument to the jury within the proper bounds of evidence and procedure.

## CONCLUSION

Wherefore, the government respectfully requests that this Court deny Defendant's Motion for a New Trial or Judgment of Acquittal.

                                        Respectfully submitted,

                                        JOHN R. LAUSCH, Jr.
                                        United States Attorney

By:    */s/ Matthew M. Schneider*
        MATTHEW M. SCHNEIDER
        NANI M. GILKERSON
        Assistant United States Attorneys
        219 S. Dearborn Street
        Chicago, Illinois 60604
        (312) 886-0973

Date: November 28, 2017