**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 16 CR 361 |
| V. | ) | |
| | ) | Hon. Virginia M. Kendall |
| WILLIAM MIKAITIS, | ) | |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER

On June 2, 2016, a grand jury indicted Defendant William Mikaitis with one count of conspiracy to distribute a controlled substance outside of the usual course of professional practice and without a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1) (Count One), seven counts of distributing a controlled substance outside of the usual course of professional practice and without a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts Two through Eight), and seven counts of dispensing prescription drugs without a valid prescription in violation of 21 U.S.C. §§ 353(b)(1), 331(k) and 333(a)(2) and 18 U.S.C. § 2 (Counts Nine through Fifteen). (Dkt. No. 1). On November 17, 2016, the grand jury returned a superseding indictment adding charges against Mikaitis for conspiracy to conduct financial transactions with drug proceeds to promote unlawful activity in violation of 18 U.S.C. § 1956(h) (Count Sixteen) and engaging in a monetary transaction involving criminally derived property having a value greater than $10,000 in violation of 18 U.S.C. § 1957 (Count Seventeen). (Dkt. No. 38). The case proceeded to a jury trial, and after five days, on September 5, 2017, the jury found Mikaitis guilty of all seventeen counts. (Dkt. No. 85). On October 17, 2017, Mikaitis filed a Motion for Judgment of Acquittal pursuant to

Rule 29 or for a New Trial pursuant to Rule 33. (Dkt. No. 95). For the following reasons, Defendant Mikaitis' Motion [95] is denied.

## BACKGROUND

Defendant William Mikaitis was a physician licensed to practice medicine in the State of Illinois and worked for 33 years as a general practitioner, primarily in the field of family medicine. (Mikaitis Tr. at 8:11-9:1). In October 2012, a drug representative, Angelo Sperando, introduced Mikaitis to co-defendant Michael Jennings. (Mikaitis Tr. at 9:23-10:14). Jennings ran Results Weight Loss Clinic and needed a physician to keep the clinic open because the physician previously working with him had lost his license. (Sperando Tr. at 5:10-18; Mikaitis Tr. at 10:15-17). At that time, Mikaitis was working full-time for Advocate Hospital at a clinic in Lockport, Illinois. (Mikaitis Tr. at 8:15-20). Jennings offered to pay Mikaitis cash to obtain a DEA registration number for the clinic to use and review patient charts, and Mikaitis agreed. (*Id*. 11:6-12:15).

Mikaitis obtained a new DEA registration number specifically for the clinic to use and authorized Jennings to use the DEA registration number and his credit card to place bulk orders of the diet medication phentermine, a controlled substance, for distribution to clinic patients. (*Id*. at 23:23-24:5, 35:14-36:2). Jennings then reimbursed Mikaitis for the cost of the medication. (*Id*. at 65:11-21). In two years, Jennings ordered more than 530,000 pills, or 17,000 monthly prescription bottles, of weight loss medication costing more than $84,000 using Mikaitis' card and registration number. (*Id*. at 58:18-59:4, 65:11-21). Jennings dispensed the medication to patients at the clinic and sent medication via mail to patients who placed orders over the phone. (*Id*. at 26:5-15, 61:7-14). Jennings who had no medical license met with and spoke to patients before

dispensing the medication. (*Id*. at 46:15-25). No licensed professional met with any patient before the medication was provided.

Mikaitis visited the clinic once a week to pick up his weekly cash payment of $1,750 and reviewed between four to eight patient charts each week but never saw any patients in person, prepared medical charts for patients, or reviewed charts of other patients receiving medication from the clinic. (*Id*. at 13:7-20, 24:17-18, 47:17-19). Mikaitis deposited the cash payments into a joint account he shared with a woman with whom he was having an affair, Vesta Valuckaite, and the two used the funds for travel, a down payment on a car, and other expenses. (*Id*. at 33:15-25, 81:11-82:22, 89:7-12; Valuckaite Tr. at 23:14-17, 33:14-35:12)

On January 21, 2015, two DEA agents visited the Results clinic and questioned Jennings and Mikaitis. (Kasza Tr. at 4:11-16; Mikaitis Tr. at 84:1-13). The next day, the DEA agents visited the clinic in Lockport where Mikaitis worked full-time and questioned Mikaitis again. (Kasza Tr. at 19:13-21, 20:23-21:16, 22:5-23:5; Mikaitis Tr. at 87:6-14). Jennings and Mikaitis were indicted in June 2016 and the Court held a jury trial from August 28, 2017 to September 5, 2017.

The jury heard from clinic patients, a DEA agent, Valuckaite, Sperando, an expert in bariatric medicine, and Mikaitis himself regarding Jennings' and Mikaitis' distribution of phentermine through the Results Weight Loss Clinic. The jury judged the credibility of the witnesses, weighed the evidence and found Mikaitis guilty on all seventeen counts. Mikaitis claims that the jury was wrong and the Government did not meet its burden of proof on any of the charges against him. Mikaitis also challenges one jury instruction and claims the Court erroneously curtailed defense counsel's closing argument.

## DISCUSSION

Mikaitis argues that the Court should enter a judgment of acquittal pursuant to Rule 29 for each count because the Government failed to meet its burden of proving him guilty beyond a reasonable doubt. Mikaitis moves in the alternative for a new trial pursuant to Rule 33 on two grounds: (1) that the "ostrich" instruction was given to the jury in error and (2) that the Court erroneously limited Mikaitis' closing argument. (Dkt. No. 95). Mikaitis is not entitled to any of the relief sought.

## I.      Ample Evidence in the Record Supports the Jury's Verdict

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction against a defendant. *See* Fed. R. Crim. P. 29. Mikaitis faces "a nearly insurmountable hurdle" in contending that the jury had insufficient evidence to convict him. *See United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) (citing *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014)). Once convicted, the Court reviews the evidence presented to the jury in the light most favorable to the Government and makes all reasonable inferences in the Government's favor. *See United States v. Cejas*, 761 F.3d 717, 726 (7th Cir. 2014) (citing *United States v. Larkins*, 83 F.3d 162, 165 (7th Cir. 1996)). The Court may overturn the jury's guilty verdict "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (quoting *United States v. Stevenson*, 680 F.3d 854, 855-56 (7th Cir. 2012)). "If there is a reasonable basis in the record for the verdict, it must stand." *United States v. Moshiri*, 858 F.3d 1077, 1082 (7th Cir. 2017) (citing *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000)). The jury must weigh the evidence and assess the witnesses' credibility,

and courts do not "second-guess the jury's assessment of the evidence." *See United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008).

Mikaitis argues he is entitled to a judgment of acquittal because the Government failed to prove beyond a reasonable doubt that he had any knowledge that any medication would be distributed to any patient without a legitimate medical purpose and that each count for which he was indicted required that the Government prove such knowledge. Under the theory that each count required the same proof of knowledge, Mikaitis focuses its argument on only the conviction for violating 21 U.S.C. § 841(a)(1) in Count One.[1]

Title 21 U.S.C. § 841(a)(1) provides that it is "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." To convict a physician under Section 841(a)(1), the Government must show "that he prescribed controlled substances (1) 'outside the course of professional practice' and (2) without a 'legitimate medical purpose.'" *United States v. Pellmann*, 668 F.3d 918, 923 (7th Cir. 2012) (quoting *United States v. Bek*, 493 F.3d 790, 798 (7th Cir. 20007)); s*ee also United States v. Chube II*, 538 F.3d 693, 697 (7th Cir. 2008) ("In order to support a violation of [21 U.S.C. § 841(a)(1)], the jury had to find that the Doctors knowingly and intentionally acted outside the course of professional practice and without a legitimate medical purpose.") (internal quotation omitted).

Contrary to Mikaitis' claim, the Government presented ample evidence that Mikaitis knew prescription drugs were distributed to clinic patients without a legitimate

---

[1] Because the Court finds ample evidence in the record to support the jury's finding that Mikaitis knew medication was distributed to patients without a legitimate medical purpose, it need not determine whether each count, in fact, required the same proof of knowledge.

medical purpose. Sperando's testimony suggested that at the very least, Mikaitis should have been suspicious of Jennings' business from the outset. Sperando testified that he told Mikaitis that Jennings needed a doctor in order to keep his business afloat because he needed a DEA registration number to order prescription drugs for distribution and the physician previously working with him had lost his license. (Sperando Tr. at 5:10-23). Sperando testified further that he told Mikaitis that, if he worked with Jennings, he would not need to see any patients and would be paid weekly in cash. (*Id.* at 6:5-20).

Mikaitis' own testimony suggests he knew that Jennings was the only person seeing patients at the clinic and that patients were not seen by a licensed professional before being given phentermine. Mikaitis testified that he knew Jennings did not have a license to practice medicine or prescribe drugs. (Mikaitis Tr. at 46:15-25). He also testified that he never saw or agreed to see any patients and that he never saw any other licensed physician at the clinic when he visited. (*Id*. at 47:17-19). In fact, the only person he did see at the clinic was Jennings. (*Id*. at 49:22-50:5). Sperando similarly testified that he picked up his payment from the clinic on a weekly or bi-weekly basis and, while there, saw that Mikaitis was the only person seeing patients. (Sperando Tr. at 13:20-14:13, 17:2-11). Furthermore, Jennings actually told Mikaitis in text messages that he was seeing patients. For example, on July 19, 2014, Jennings texted Mikaitis, "I got extremely busy these last couple days. It's probably because of the week I'm not in the office next Saturday, everybody's getting in early. I'm finishing up a with [sic] couple more people." (James Tr. at 33:6-9). Similarly, on May 2, 2014 Jennings texted Mikaitis, "I was here late yesterday with last-minute new patients." (*Id*. at 20:9).

Texts between Jennings and Mikaitis also showed that Mikaitis did check his credit card statements reporting the purchases made with his DEA registration number. For example, on October 15, 2013, Mikaitis asked Jennings, "Good morning, Mike. Did you order anything from a company Anda?" and Jennings responded, "Yes, I'll make deposit today 306 and tomorrow 881 for Hauser." (*Id*. at 15:13-16:2). The text shows that Mikaitis clearly monitored Jennings' purchases.

The Government also presented evidence that Mikaitis knew Jennings unlawfully shipped prescription drugs to patients. Valuckaite testified that she overheard Mikaitis talking on the phone to Jennings about "shipments" and that Mikaitis told her Jennings shipped refills of phentermine prescriptions to patients. (Valuckaite Tr. at 16:1-23). Sperando testified that a few times when he picked up his cash payments from the clinic he saw medications that Jennings had prepared to mail out on Jennings' desk in his office. (Sperando Tr. at 17:12-18). Mikaitis visited the clinic weekly, each time going into Jennings' same office, yet claims he never saw any signs that medication was being shipped to patients. (Mikaitis Tr. at 61:3-62:6).

The jury also heard evidence that Mikaitis attempted to keep his association with the Results clinic secret reflecting his knowledge of it illegality. Mikaitis' employment agreement with Advocate Hospital required that he obtain written approval before entering into any outside engagement but he failed to do so when he partnered with Jennings. (*Id*. at 52:5-53:10) Mikaitis did not even tell his colleagues and staff members at Advocate Hospital where he worked full-time about his arrangement with Jennings. (*Id.* at 54:11-55:10). Mikaitis also failed to report any of his cash earnings from Jennings to the IRS when he filed his taxes. (*Id*. at 55:15-58:17).

Additionally, DEA Agent Kasza testified that Mikaitis lied to her and her partner when questioned about operations at Results. Agent Kasza and her partner visited Results on January 21, 2015 and questioned Mikaitis and Jennings. Mikaitis was not at the clinic when they arrived that morning but came around noon after Jennings called him. (Kasza Tr. at 10:9-17; Mikaitis Tr. at 84:1-25). Agent Kasza testified that Mikaitis told the DEA agents that he worked at the clinic during regular operating hours and saw eight to ten patients a day, that all new patients undergo a physical and metabolic testing and that patients were required to come to the clinic for an in-person meeting to obtain a refill. (Kasza Tr. at 10:15-11:22, 12:18-13:6). She testified that the next day, when the DEA agents found Mikaitis working full-time in Lockport, Mikaitis admitted that he did not see patients at Results and that Jennings dispensed weight loss medication with his DEA registration number including by mail and then surrendered his DEA registration number for cause. (*Id.* at 19:13-21, 20:23-21:16, 22:5-23:5).

The jury was shown undercover video footage that was taken by undercover agents who visited Results. The footage revealed that Mikaitis was never present and that Jennings distributed the controlled drug to the agents even when their body mass index did not warrant it and even when they stated they only desired to lose 5-10 pounds. After seeing and hearing how the clinic was actually operated, the Defendant chose to take the witness stand and testify in his own behalf.

FinDuring his testimony, Mikaitis admitted at trial that he authorized dispensing phentermine to a patient without a legitimate medical purpose. Dr. Piotrowski, an expert in bariatric medicine, testified that anorectic medications such as phentermine are indicated for patients who have a body mass index (BMI) of 30 or above or who have a

BMI of 27 or above and an existing medical issue such as high blood pressure or diabetes. (Piotrowski Tr. at 15:2-6). She also testified that, in her expert opinion, a physician should conduct a comprehensive patient evaluation before prescribing weight loss medication to a patient for the first time and that such evaluation would include assessing the patient's medical history, conducting a physical exam to detect any conditions the patient may not be aware of, and running tests such as blood work or otherwise requiring copies of tests run by the patient's primary physician. (*Id.* at 11:6-14:13).

Mikaitis further admitted at trial that he authorized dispensing phentermine to a patient who had not received a patient evaluation and who had a BMI under 27. Specifically, on cross-examination, Mikaitis admitted that he authorized dispensing weight loss medication to patient Jocelyn Evans whose chart indicated she had a BMI of 19 and had received no physical exam or any other tests. (Mikaitis Tr. at 74-75). Mikaitis then agreed there was no legitimate medical purpose to dispense phentermine to that patient:

> Q. . . . You authorized, by the initials on that chart, the dispensing of medication to that patient; isn't that right?
>
> A. Yes.
>
> Q. Okay. And all the information that you had was the height and the weight and the blood pressure that's there right?
>
> A. Correct.
>
> Q. And, nevertheless, you approved the dispensing of that medication, right?
>
> A. Correct.
>
> Q. And looking at that chart, sir, you would agree there's no legitimate medical purpose to the dispensing of controlled substances to Jocelyn [] Evans?

. . .

A.  Yes sir.

(*Id.* at 74:9-75:8).  Mikaitis reversed course on redirect examination and claimed that after a closer look at the patient's self-reported medical history and lack of medical problems, Evans could have legitimately received weight loss medication.  (*Id.* at 110:18-111:13).  However, Mikaitis did not deny that her BMI was 19, that she had not received a physical exam or any other testing, or that he had not seen her in person.  (*Id.* at 122:9-123:17).

Mikaitis's testimony was not believable when placed in conjunction with the testimony of the undercover agents, the videotapes, the text messages, and the testimony of other witnesses.  His attempt to separate himself from the clinic was not credible and the jury reached that conclusion after judging his testimony and demeanor on the witness stand,  There is ample evidence in the record from which the jury could have found that Mikaitis knew phentermine was distributed to patients without a legitimate medical purpose.  Because there is a reasonable basis in the record for the verdict, it must stand and Mikaitis is not entitled to a judgment of acquittal.

## II.     The Court Did Not Err and No New Trial is Warranted.

Rule 33(a) of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33; *see also United States v. Berg*, 714 F.3d 490, 500 (7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012).  The Court need not view the evidence in the light most favorable to the Government. *See United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).  Rather, "a defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial

10

effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006). Indeed, the Court cannot reweigh evidence or set aside a verdict because the Court thinks that another finding would have been more reasonable. *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989). Rule 33 motions are generally disfavored and courts only grant them in "extreme" cases. *See United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quoting *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990) (internal citations omitted)); *see also United States v. Kamel*, 965 F.2d 484, 490 n.7 (7th Cir. 1992). The Court "approach[es] such motions with great caution" and a jury verdict in a criminal case is not to be overturned lightly. *See United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005) (internal quotation omitted); *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). Here, Mikaitis argues that alleged errors by the Court in including a jury instruction on deliberate avoidance and in sustaining certain objections during closing argument warrant a new trial. The Court did not err and no new trial is warranted.

### A. The Court Properly Instructed the Jury on Deliberate Avoidance.

Mikaitis argues that the Court erred in including a jury instruction on deliberate avoidance, or an "ostrich" instruction. The Court gave an ostrich instruction as part of the instruction defining "knowingly" which stated in relevant part:

> You may find that the defendant acted knowingly if you find beyond a reasonable doubt that he had a strong suspicion that Michael Jennings was distributing controlled substances outside of the usual course of professional practice and without a legitimate medical purpose and that he deliberately took actions to avoid the truth. You may not find that the defendant acted knowingly if he was merely mistaken or careless in not discovering the truth, or if he failed to make an effort to discover the truth.

(Dkt. No. 83, Jury Instructions at 32).

Jury instructions must be accurate statements of the law that are supported by the facts in the case. *See United States v. Mancillas*, 183 F.3d 682, 707 (7th Cir.1999). The instruction given is nearly identical to the Seventh Circuit pattern instruction defining "knowingly" and Mikaitis does not dispute that the instruction is an accurate statement of the law. *See* Seventh Circuit Criminal Pattern Jury Instruction 4.10; *see also United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014) (The Court "presume[s] that the Pattern Criminal Jury Instructions for the Seventh Circuit correctly state the law.") (citing *United States v. Leahy*, 464 F.3d 773, 796 (7th Cir. 2006)). Rather, Mikaitis argues there was no basis for an instruction on deliberate avoidance in the first place.

The evidence presented at trial warranted giving this instruction. "The purpose of the ostrich instruction 'is to inform the jury that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings.'" *United States v. Carrillo*, 435 F.3d 767, 780 (7th Cir. 2006) (quoting *United States v. Craig*, 168 F.3d 891, 896 (7th Cir. 1999)). An ostrich instruction is appropriate where: "(1) a defendant claims a lack of guilty knowledge and (2) the government presents evidence that suggests that the defendant deliberately avoided the truth." *United States v. Pabey*, 664 F.3d 1084, 1092 (7th Cir. 2011) (quoting *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2010)). Mikaitis does not dispute that he claimed a lack of guilty knowledge at trial but contends the Government failed to present sufficient evidence from which the jury could have concluded that he deliberately avoided the truth about weight loss medication being distributed to patients without a legitimate medical purpose.

The Government can establish deliberate avoidance through two types of evidence: (1) evidence "that the defendant committed overt physical acts to avoid the knowledge" and (2) evidence "showing purely psychological avoidance, otherwise described as the 'cutting off of one's normal curiosity by an effort of will.'" *Pabey*, 664 F.3d at 1092 (quoting *Carillo*, 435 F.3d at 780).[2] "[A] jury can infer the deliberate avoidance of knowledge from circumstantial evidence alone." *Id.* (citing *Carillo*, 435 F.3d at 781). The key questions are "what the defendant knew and whether that knowledge raises a reasonable inference that [he] remained deliberately ignorant of facts constituting criminal knowledge." *Id.* (quoting *United States v. Ramirez*, 574 F.3d 869, 877 (7th Cir.2009)).

Here, the Government provided both types of evidence. The Government showed that Mikaitis committed overt physical acts to insulate himself from the unlawful activity happening at Results. Mikaitis visited the clinic at most once a week over a two year period. Each time, he entered through the side door instead of the front entrance, went "right to Jennings' office" to review the handful of files provided to him and "didn't look anywhere in the clinic." (Mikaitis Tr. at 49: 24-50:2). Mikaitis knew the patient files

---

[2] The Seventh Circuit decision in *United States v. Macias* did not overturn precedent holding that deliberate avoidance can be shown by either physical or psychological evidence for purposes of giving an ostrich instruction, as Mikaitis argues. 786 F.3d 1060 (7th Cir. 2015). In *Macias*, the Seventh Circuit noted only that the phrase "cutting off … one's normal curiosity by an effort of will," often used to define psychological evidence, is dispensable and over-complicates the law but confirmed that "there indeed are circumstances in which a failure to ask questions is unnatural—a ducking of responsibility, a violation of duty, and perhaps therefore the equivalent of taking evasive action to avoid confirming one's suspicions." *Id.* at 1063-64. Regardless, out of an abundance of caution, the Court specifically added the language "deliberately *took actions* to avoid the truth" during the parties' jury instruction conference to address Mikaitis' concerns, emphasize for the jury that a finding of mere negligence was not sufficient, and to account for any change in the law that might have resulted from *Macias*. (Jury Instruction Conference Tr. at 13).

were kept at in the front room of the clinic. (*Id.* at 78:14-79:6). By entering through the side door and not looking around he actively avoided the reception area where patients checked in and the file room where the thousands of patient files were kept. *See, e.g., United States v. Diaz*, 864 F.2d 544, 551 (7th Cir. 1988) (finding ostrich instruction warranted where evidence showed defendant insulated himself from drug transaction by absenting himself from the scene or, when present, preoccupying himself under the hood of his car so that he could deny knowledge of the transaction). Mikaitis also actively insulated himself from the orders for phentermine Jennings placed with his DEA registration number. The bulk orders were initially delivered to Mikaitis' office in Lockport but he changed the delivery address so that all further shipments would go directly to the clinic. (*Id*. at 59:5-60:15). As a result, Mikaitis managed to avoid seeing the volume of drugs being purchased and distributed by Jennings. Finally, unlike Mikaitis who claims he failed to notice any unlawful activity in the clinic for over two years, a nurse practitioner who worked very briefly at the clinic testified that she noticed almost immediately that Jennings was unlawfully distributing prescription drugs to patients and quit just two days after starting to work at Results for fear of losing her license. *See, e.g., Leahy*, 464 F.3d at 796-97 (7th Cir. 2006) (finding that contrast between defendant's claimed ignorance of insurance scheme despite years of involvement with the client and the reaction of another broker who immediately identified misclassifications in paperwork was evidence of deliberate avoidance warranting ostrich instruction).

The Government also presented psychological evidence showing Mikaitis was suspicious that Jennings was distributing phentermine to patients without a legitimate

medical purpose and refused to ask questions confirming his suspicion. From the outset, Mikaitis knew the physician that previously worked with Jennings at the clinic lost his license and that, contrary to ordinary practice, Jennings insisted on paying him in cash. (Mikaitis Tr. at 12:9-20; Sperando Tr. at 5:10-18). He also knew that Jennings did not have a license to practice medicine or dispense prescription drugs, that he had not been asked and did not agree to see any patients and that no other licensed physician was associated with the clinic. (Mikaitis Tr. at 13:7-23, 45:10-46:25, 47:17-19). After all, as Mikaitis knew, Mikaitis was the physician listed on the Results business card and Mikaitis' license and DEA registration number were hanging on the wall in the clinic. (*Id.* at 47:1-16). Yet Mikaitis never asked Jennings who was seeing patients at the clinic and who was dispensing controlled substances under his DEA registration number. (*Id.* at 50:20-51:5). Valuckaite testified that Mikaitis also knew Jennings mailed controlled substances to patients but Mikaitis never inquired as to why prescription drugs were being sent via mail or whether any physician had seen the patients or approved the prescriptions beforehand. (Valuckaite Tr. at 16:1-23). Finally, Mikaitis allowed Jennings to use his credit card to purchase drugs for the clinic but claimed he never looked, either at his credit card statements or his DEA registration, to see how many drugs Jennings purchased. (Mikaitis Tr. at 36:18-38:1, 63:20-64:10). Given the circumstances, Mikaitis' failure to ask basic questions about the operation was unnatural, particularly for a physician with 33 years' experience working in medical clinics. *See Leahy*, 464 F.3d at 796 (7th Cir. 2006) (defendant's failure to ask questions despite being exposed to numerous red flags obvious to someone of his training and experience was evidence of deliberate avoidance and warranted ostrich instruction); *United States v.*

*Inglese*, 282 F.3d 528, 538 (7th Cir. 2002) (failure by defendant-employees of gun shop to ask any follow-up questions or take any action to find out whether straw gun purchases were occurring, despite suspicious circumstances, was evidence of deliberate avoidance that warranted giving an ostrich instruction); *Craig*, 178 F.3d at 897-98 ("[F]ailure to ask questions that would certainly arise from the circumstances . . . is evidence that could lead a jury to determine [the defendant] deliberately avoided learning about the [ ] scam.").

Because the ostrich instruction was an accurate statement of the law that was supported by the facts of the case, the Court did not err in giving it to the jury.

**B.     The Court Properly Sustained the Government's Objections during Mikaitis' Closing Argument.**

Mikaitis argues that a new trial is warranted because the Court infringed on his right to present a complete defense by erroneously sustaining the Government's objections during closing argument.  (Dkt. No. 95 at 9).  Mikaitis fails to identify which objections he is referring to or show how the Court erred in sustaining any objections or infringed on his rights in any way.  He states merely that the defense counsel "was not misstating any law or violating any of orders of the Court" but provides no case law to support his argument.  On this basis alone, Mikaitis is not entitled to a new trial on this ground.  *See United States v. Jones*, 224 F.3d 621, 626 (7th Cir.2000) ("The lack of development of an argument and absence of supporting case law 'speaks to the paucity of the argument'" and "[a]rguments that are not adequately developed or supported are waived") (quoting *United States v. Watson*, 189 F.3d 496, 500 (7th Cir. 1999)).

Regardless, the Court did not err in sustaining any objections made by the Government during defense counsel's closing argument.  The Court sustained seven

objections raised by the Government and identified one improper argument on its own. (*See* Defense Closing Tr. at 60-69). Contrary to Mikaitis' contention, most of the arguments objected to and sustained either misstated the law or directly violated a prior Court order. The other arguments were clearly improper under Seventh Circuit law.

Specifically, the Court properly sustained objections to defense counsel's jury nullification arguments—that the jury should "let [Mikaitis] go home" (*id.* at 14:21), that the prosecutors were going after Mikaitis (prosecutorial misconduct argument) (*id.* at 37:22-23), that the DEA agents improperly decided not to record Mikaitis' statements (agent misconduct) (*id.* at 38:1-3), and that the jury should "stand up to the government" (*id.* at 59:24-60:1)—as improper and in violation of the Court's prior ruling granting the Government's unopposed motion to bar evidence or argument designed to elicit jury nullification, including evidence of the possible penalties the Mikaitis faced if convicted. (*See id*. at 61-62; *see also* Dkt. No. 73). Similarly, the Court correctly ruled that defense counsel's argument defining reasonable doubt—"I believe this is sufficient to say, is there a reasonable doubt about whether Dr. Mikaitis knew? the medical charts say yes. Dr. Mikaitis isn't guilty. It is that simple. There is a reasonable doubt and this is it . . . ." (Defense Closing Tr. at 59:3-13)—was improper and violated the Government's unopposed motion to bar Defendant from defining reasonable doubt during closing argument. (*See id*. at 61-62; *see also* Dkt. No. 73). The Court also properly sustained objections to defense counsel's arguments that the Government had to prove that Mikaitis had a bad intent toward his patients (Defense Closing Tr. at 49:6-10, 51:1-5, 58:24-25) and that Jennings did not lie to Mikaitis (*see, e.g., id*. at 8:24-25) as misstatements of the

law because neither was an element the Government had a burden to prove. (*See id.* at 62:3-10).

The Court properly sustained the Government's objection to defense counsel's arguments that the jury should put themselves in the defendant's shoes. (*Id*. at 57:9-12 ("Would anyone think about a friend or relative, neighbor or relative, who was in Dr. Mikaitis' position, would anybody think that it was fair for him to be convicted? No one would.")). The Seventh Circuit has repeatedly held that such a "'Golden Rule' appeal in which the jury is asked to put itself in the defendant's position 'is universally recognized as improper because it encourages the jury to depart from the neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" *United States v. Roman*, 492 F.3d 803, 806 (7th Cir. 2007) (affirming district court's ruling barring "Golden Rule" arguments) (quoting *United States v. Teslim*, 869 F.2d 316, 328 (7th Cir.1989)). Finally, the Court also properly sustained the Government's objection to defense counsel's argument that the jury should infer from the fact that the Government did not subpoena Mikaitis' accountant to testify at trial that the accountant is a liar and Mikaitis is a truth-teller because it essentially provided the jury a missing witness instruction in spite of the fact that the accountant was not unavailable to Mikaitis nor solely within the Government's control. (Defense Closing Tr. at 27:9-28:22). "The missing witness instruction is disfavored in this circuit" and is only appropriate in "unusual circumstances" where the criminal defendant can "show (1) that if called, the witness would have been able to provide relevant, noncumulative testimony on an issue in the case; and (2) that the witness was peculiarly in the other party's power to produce." *United States v. Wright*, 722 F.3d 1064, 1068–69 (7th Cir. 2013) (quoting *United States v.*

*Tavarez*, 626 F.3d 902, 904-05 (7th Cir. 2010)) (district court did not abuse its discretion in denying defendant's request for missing witness instruction). Mikaitis did not attempt to make either showing here.

Furthermore, Mikaitis was not unfairly prejudiced in any way by the Court's proper sustaining of the Government's objections. *See United States v. Bishawi*, 272 F.3d 458, 462 (7th Cir. 2001) ("An error is harmless, and therefore does not mandate reversal and a new trial, unless it affects 'substantial rights.'"); Fed. R. Crim. P. 52(a). The Government—and not the Court—raised these objections during defense counsel's closing argument, as it has a right to do, and the Court promptly sustained or overruled each objection on the record and then permitted defense counsel to continue his argument as planned. (*See, e.g.,* Defense Closing Tr. at 14:22-15:1, 20:5-7, 37:24-25, 38:4-5, 47:5-8, 57:13-16, 57:22-23, 59:14-18, 60:2-4). The Court did *not* at any point improperly curtail the closing argument or prohibit defense counsel from presenting proper arguments. The Court also never "ma[d]e it seem to the jury like [Mikaitis'] counsel was doing something improper when he was not," as Mikaitis claims. (Dkt. No. 95 at 10). In fact, when either party sought to argue the grounds for an objection further, the Court prevented any prolonged interruption of defense counsel's argument in front of the jury by stating that a jury instruction would address the issue and instructing defense counsel to continue. (*See, e.g.*, *id*. at 27:15-28:4 ("MR. SCHNEIDER: Objection, Judge, to that argument. MR BRINDLEY: That argument is perfectly legitimate, Judge. THE COURT: Wait, hold on, hold on. MR BRINDLEY: They could have called the accountant - - THE COURT: What did you just say? MR. SCHNEIDER: They could have called the accountant. MR. BRINDLEY: I'll address that argument, Judge. THE

COURT: All right. All right. So there is going to be a further instruction based on this, but continue your argument -- MR BRINDLEY: I will. THE COURT: -- and we'll address it before the jury is out, okay?"), 28:17-22 ("MR. SCHNEIDER: Judge, I have a continuing objection -- THE COURT: Sustained. MR. SCHNEIDER: -- to this line of argument. THE COURT: It's sustained. And we'll have an instruction to the jury shortly."), 41:12-19 ("MR. SCHNEIDER: Object to that. MR. BRINDLEY: I -- that's an argument, Judge. THE COURT: Okay, Ladies and Gentlemen, as far as the evidence is concerned, if it differs from what you know it to be, then it's your collective understanding that will prevail, and the arguments and reasonable inferences, as I mentioned before, are not the evidence. So you may continue."), 52:3-8 ("MR. SCHNEIDER: I object to counsel rephrasing a jury instruction. THE COURT: Okay. Sustained. Remember, I am going to give you the law. Just follow my instructions. You can continue."). Then, *after* defense counsel's closing argument concluded and *outside of the presence of the jury*, the Court addressed the eight improper arguments defense counsel made during closing argument. (*See id.* at 61-69).

Not only were each of the objections properly sustained, defense counsel was aware that each of these arguments were not permitted based on the Court's pretrial conference which granted the Government's motion to preclude jury nullification arguments. The Government moved pretrial to bar the defense counsel from defining reasonable doubt, and mentioning any possible penalties that the defendant might receive. (Dkt 65) All of these motions were granted by the Court and therefore became court orders and all of them were violated by defense counsel during closing argument.

Because the objections were properly sustained and Mikaitis failed to show any harm, he is not entitled to a new trial on this basis.

## **CONCLUSION**

For the reasons outlined above, the Court denies Mikaitis's Motion for a Judgment of Acquittal or New Trial.  [95.]

_____
Hon, Virginia M. Kendall
United States District Judge

Date: April 25, 2018